JOURNAL ENTRY AND OPINION
{¶ 1} Ronald Oleksiak appeals the trial court's order granting summary judgment in favor of John Carroll University and Father Edward Glynn. Ronald Oleksiak argues that the trial court erred in granting summary judgment on his claims of reverse race discrimination and age discrimination. For the following reasons, we affirm in part, reverse in part and remand.
 {¶ 2} Ronald Oleksiak (Oleksiak) is a 68-year-old white male. From 1961 until approximately 1986, he worked for the Cleveland Board of Education. In 1986, Oleksiak began working part time for John Carroll University (University) as a minority admissions counselor. In 1987, Oleksiak began working solely for the University and established the Office of Minority Affairs, which later came to be called the Office of Multi-Cultural Affairs (OMA). Oleksiak served and held the position of director of the OMA until his departure from the University in August 2002. The University based Oleksiak's employment on a series of annual contracts, which it supplied to him at the end of each year. Additionally, Oleksiak received a letter from the Academic Vice President, the individual to whom he reported, commenting on his performance for the previous year. When Oleksiak created the OMA, he comprised the entire staff. Over time, the OMA expanded and a committee selected Dr. Shirley Seaton to be the assistant director for the OMA. Dr. Seaton is an African-American woman who is over the age of 40. During his time as director of the OMA, different individuals occupied the office of academic vice president and Oleksiak reported to each of the individuals respectively. First, Dr. Frederick Travis occupied the office, followed by Dr. David LaGuardia, and then Dr. James Krukones.
 {¶ 3} In 1998, Father Edward Glynn became the acting president while the University conducted a search for a new president. In December 1998, the University selected Fr. Glynn to be the president of the University. As president, Fr. Glynn openly expressed his concern for the lack of diversity among the students, staff, and administration of the University. Furthermore, Oleksiak has alleged that Fr. Glynn expressed indirectly, "why an old, white guy was in the position of OMA director?"
 {¶ 4} On July 30, 1998, Dr. Travis, the then academic vice president, formed a committee to review the University's Office of International Studies. This was done as part of an on-going effort to review various departments of the University that were not regularly subject to review. The committee issued a final report in April 1999 and recommended several courses of action. One item in particular recommended that the University conduct a search for a new director of the office, with the current director being invited to apply for the position. The University followed the recommendation and selected a new director to run the office.
 {¶ 5} In December 2002, Dr. Travis formed a committee to review the OMA. Dr. Travis appointed John Gladstone to chair the review committee and then selected the remaining committee members. It is undisputed that John Gladstone and Fr. Glynn had previously spoken on the issue of diversity at the University. The review committee met over the course of five months during which time multiple sessions were devoted to meeting with Oleksiak and Dr. Seaton. Additionally, the review committee met with University students to gather their input regarding the OMA and how things could be improved. The overall sentiment relayed by the students was that the addition of younger minorities on the staff of the OMA would improve its relations with students.
 {¶ 6} On May 18, 2001, the review committee submitted its final report to Dr. Travis setting forth several recommendations. Dr. Travis reviewed the report and requested that the review committee extend its life in order to clarify its report and undertake additional goals. On September 13, 2001, the committee submitted its supplemental report to Dr. LaGuardia, the new academic vice president. The supplemental report set forth several recommendations including the recommendation that the associate vice president consider conducting a national search to select new candidates to fill the director and associate director of the OMA, with the current director and associate director being invited to apply. The committee suggested that said positions should be advertised in nationally recognized publications like the Chronicle of Higher Education, Black Issues in Higher Education, and Hispanic Outlook. Finally, the committee issued a statement attempting to correct any misunderstandings concerning age-related comments. Specifically, the committee reported that "while trying to candidly * * * report student sentiment as expressed during the review, the committee did not mean to suggest that the University should use age as a factor when evaluating OMA personnel and staffing."
 {¶ 7} Dr. LaGuardia decided to accept the committee's recommendation to conduct a nationwide search for the OMA director and associate director positions and communicated his decision to Fr. Glynn. Dr. LaGuardia then provided Oleksiak with a copy of the supplemental report and informed him of the decision to accept the committee's recommendations. During this conversation, LaGuardia acknowledged that Oleksiak could apply for his position. Oleksiak then asked Dr. LaGuardia whether he stood the same chance as the other candidates. At one point, Oleksiak responded that Dr. LaGuardia's response was, "I guess not," while another time, Oleksiak stated that Dr. LaGuardia's response was, "no."
 {¶ 8} Oleksiak and Dr. LaGuardia then discussed Oleksiak's option to retire from the University. Oleksiak demanded two years' salary and the University rejected this demand. Oleksiak then asked about having two additional months of pay and benefits at the end of his term in August 2002. The University agreed to this request. Subsequently, Dr. LaGuardia prepared a retirement letter for Oleksiak and asked for Oleksiak's signature. Oleksiak signed the letter, which provided that he agreed with and accepted the details regarding his retirement. Dr. LaGuardia then timed the announcement of Oleksiak's retirement to coincide with the announcement of the national search for the position of OMA director. Following the announcement of Oleksiak's retirement on January 31, 2002, Oleksiak continued to work for the University through the end of August 2002 and received his full salary and benefits through October 2002. The University held a retirement party in Oleksiak's honor and he attended.
 {¶ 9} Prior to Oleksiak signing his retirement letter, Dr. LaGuardia appointed a search committee. Dr. Seaton applied for the position of director of the OMA but she was not selected for either the director or the associate director. Dr. Seaton continues to work for the University as a consultant. The committee narrowed the search and interviewed four prospective candidates. Oleksiak participated in the process by interviewing candidates and providing feedback to the search committee on the candidates that he interviewed. During this process, Gwendolyn Kinebrew, chair of the search committee, wrote a letter recommending Juliana Mosley Anderson. Among other things, the letter specifically referred to Dr. Mosley-Anderson as "young." Dr. LaGuardia decided to hire Dr. Juliana Mosley-Anderson as the director of OMA. Dr. Mosley-Anderson is an African-American female under the age of 40.
 {¶ 10} During Oleksiak's term as director of the OMA, the percentage of minority students attending the University generally increased; since his departure, the percentage has decreased.
 {¶ 11} John Carroll University and Father Glynn filed a joint motion for summary judgment arguing there were no genuine issues of material fact to support Oleksiak's claims of reverse race and age discrimination. The trial court granted the motion and Oleksiak appeals, raising two assignments of error.
STANDARD OF REVIEW:
 {¶ 12} Appellate review of summary judgment is de novo. Grafton v.Ohio Edison Co., 77 Ohio St.3d 102, 105, 1996-Ohio-336; Zemcik v. La PineTruck Sales Equipment (1998), 124 Ohio App.3d 581, 585. The Ohio Supreme Court set forth the appropriate test in Zivich v. Mentor SoccerClub, 82 Ohio St.3d 367, 369-370, 1998-Ohio-389, as follows:
 {¶ 13} "Pursuant to Civ.R. 56, summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor. The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." (Citations omitted)
 {¶ 14} Once the moving party satisfies its burden, the nonmoving party "may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Civ.R. 56(E); Mootispaw v. Eckstein, 76 Ohio St.3d 383, 385, 1996-Ohio-389. Doubts must be resolved in favor of the nonmoving party. Murphy v. Reynoldsburg, 65 Ohio St.3d 356, 358-359, 1992-Ohio-95.
REVERSE RACE DISCRIMINATION
 {¶ 15} In his first assignment of error, Oleksiak argues the trial court erred in granting John Carroll University and Edward Glynn's motion for summary judgment on his claim of reverse race discrimination. For the following reasons, we find that this assignment lacks merit.
 {¶ 16} R.C. 4112.02(A) provides "it shall be unlawful discriminatory practice for any employer, because of race, color, religion, sex, national origin, handicap, age, or ancestry of any person to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." R.C. 4112 is Ohio's counterpart to Section 2000e, Title 42, U.S. Code (Title VII). Accordingly, we can apply federal authority to cases involving alleged violations of R.C. Chapter 4112. See Genaro v. Cent.Transport, Inc., 84 Ohio St.3d 293, 295, 1999-Ohio-352; Plumbers Steamfitters Joint Apprenticeship Commt. v. Ohio Civil Rights Comm.
(1981), 66 Ohio St.2d 192, 196.
 {¶ 17} Race discrimination cases use the almost identical standard of review as age discrimination cases. Accordingly, the same standard of review, with a slight variation in race discrimination cases, is used in both. A plaintiff may make a prima facie showing of race discrimination in one of two ways. One, a plaintiff may "use direct evidence of age discrimination which tends to show by a preponderance of the evidence that the employer was motivated by discriminatory intent in discharging the employee." Keener v. Legacy Health Services, 148 Ohio App.3d 321,325, 2001-Ohio-4383. The Ohio Supreme Court explained direct evidence to mean "that a plaintiff establish a prima facie case of age discrimination directly by presenting evidence, of any nature, to show that the employer more likely than not was motivated by discriminatory intent." Mauzy v. Kelly Services, Inc., 75 Ohio St.3d 578, 587,1996-Ohio-265. However, if the employee is unable to establish a causal link or nexus between the employer's discriminatory statements or conduct and the act that allegedly violated the employee's rights under the statute, then the employee has not provided direct evidence of discrimination. See Byrnes v. LCI Communication Holdings Co.,77 Ohio St.3d 125, 1996-Ohio-307.
 {¶ 18} The second means of making such a prima facie case requires the plaintiff to show: (1) that he was a member of the statutory protected class; (2) that he was discharged (or that the employer took an action adverse to the plaintiff's employment); (3) that he was qualified for the position; and (4) that he was replaced by, or that his discharge permitted the retention of, a person not belonging to the protected class." Barkerv. Scovill, (1983), 6 Ohio St.3d 146, at paragraph one of the syllabus. If the plaintiff makes their prima facie case, the employer "may then overcome the presumption inherent in the prima facie case by propounding a legitimate, nondiscriminatory reason for the plaintiff's discharge. Finally, plaintiff must be allowed to show that the rationale set forth by defendant was only a pretext for unlawful discrimination." Id.
 {¶ 19} Specific to reverse race discrimination cases, some courts have altered the first element to require the plaintiff to show background circumstances supporting the inference that his employer was the unusual employer who discriminated against nonminority employees. When evaluating this element, courts will look for a showing that the employer treated employees, who were similarly situated but not members of the protected group, differently. See Grooms v. Supporting Council of Prev. Eff.
(2004), 157 Ohio App.3d 55, Murray v. Thistledown Racing Club, Inc.
(C.A.6, 1985), 770 F.2d 63, 67.
 {¶ 20} Here, Oleksiak is unable to point to direct evidence that "tends to show" that Fr. Glynn and John Carroll University "were motivated by discriminatory intent." Oleksiak puts forth several pieces of evidence in support of his claim of direct evidence of race discrimination. First, Fr. Glynn's alleged comment regarding "what an old, white guy" was doing as the director of the OMA; second, Fr. Glynn's expression of surprise over the overwhelmingly white administration; third, Fr. Glynn's statements advocating a more diverse University; fourth, the students age and race related comments in the OMA review committee's final and supplemental reports; and fifth, the letter recommending Dr. Mosley-Anderson because she was young, among other accolades.
 {¶ 21} Each is insufficient to show direct evidence of racial discrimination. As to Fr. Glynn's comment, Oleksiak admitted that he never heard Fr. Glynn make the comment. He further admitted that he only learned of the comment through other administrators whom he did not specifically identify. Additionally, when Oleksiak confronted Fr. Glynn about the comment, Fr. Glynn stated that he had no recollection of making the comment. Even assuming arguendo that Fr. Glynn made the comment and Oleksiak heard it, isolated, stray remarks generally do not establish claims of discrimination. Brewer v. Cleveland City Schools (1997),122 Ohio App.3d 378. The same could be said for the other statements made by Fr. Glynn. Fr. Glynn played no part in forming the OMA review committee; he played no part in the decision to conduct a national search for the director and associate director of the OMA; and Fr. Glynn made all statements more than three years prior to Oleksiak's departure from the University.
 {¶ 22} Additionally, Oleksiak's other proffered sources do not constitute direct evidence of race discrimination. As for the comments made in the review committee's final and supplemental reports, said comments were made by the students, not the review committee members. The committee members even addressed this issue by stating, "We would like to correct any misunderstanding with respect to age-related comments in its initial report. While trying to candidly and completely report student sentiment as expressed during the review, the committee did not mean to suggest that the University should use age as a factor when evaluating OMA personnel and staffing. The committee recognizes that age is not a permitted factor in employment decisions." Finally, the letter recommending Dr. Mosley-Anderson was not authored until after Oleksiak left the University and, therefore, could not constitute direct evidence of discriminatory animus against Oleksiak.
 {¶ 23} As to Oleksiak's indirect case of reverse race discrimination, Fr. Glynn and the University argue that Oleksiak has failed to establish background circumstances supporting the inference that the University is the unusual employer who discriminates against white employees. We agree. The vast majority of students, faculty, staff, and administrators at the University are white. Oleksiak appears to base his argument for reverse race discrimination on the fact that he was the only white director of the OMA in all Jesuit universities. This is misplaced. Oleksiak has sued Fr. Glynn and John Carroll University, not all Jesuit universities in the United States. Additionally, by treating the OMA associate director, an African-American female, in the same manner as Oleksiak, the University demonstrated a lack of preference based on race. Assuming, arguendo, that Oleksiak has demonstrated the second, third, and fourth elements of a prima facie case, he has failed to demonstrate background circumstances suggesting that the University is an employer who discriminates against Caucasian employees. Carney v.Cleveland Heights-University Heights City School District (2001),143 Ohio App.3d 415, 430.
 {¶ 24} Accordingly, it is evident that Oleksiak has not demonstrated a prima facie case of reverse discrimination through either direct or indirect evidence. Having failed to do so, the trial court did not err in granting summary judgment in favor of defendants Fr. Glynn and the University on this particular claim. Oleksiak's first assignment of error lacks merit.
AGE DISCRIMINATION
 {¶ 25} In his second assignment of error, Oleksiak argues the trial court erred in granting John Carroll University and Edward Glynn's motion for summary judgment on his claim of age discrimination. This contention has merit.
 {¶ 26} A plaintiff may establish a prima facie case of age discrimination either directly or indirectly using the standards enunciated above.
 {¶ 27} Accordingly, this court applies the same rationale concerning direct evidence of race discrimination and finds that Oleksiak has failed to establish a prima facie case of age discrimination through direct evidence.
 {¶ 28} As to Oleksiak's indirect prima facie case of age discrimination, neither the University nor Fr. Glynn dispute that Oleksiak is a member of the statutorily protected class, that he was qualified for the position, or that he was replaced by a substantially younger employee. Thus, only the second element of the prima facie case is at issue. The University and Fr. Glynn's motion for summary judgment asserted in part that because Oleksiak signed a letter of agreement setting forth the terms of his retirement, Oleksiak could not prove he was discharged, thereby failing to establish the second element of the prima facie case. In response, Oleksiak argues that he was constructively discharged because he would not have been given a chance if he applied for the director position.
 {¶ 29} An employee has been constructively discharged if "the employer's actions made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign." Mauzy v. Kelly Services, Inc., 75 Ohio St.3d 578, 1996-Ohio-265. The Mauzy court further explained that courts are to determine whether "the cumulative effect of the employer's actions would make a reasonable person believe that termination was imminent." Id. at 589. In making this determination, no single factor is decisive; instead courts are to look at all factors including "reduction in sales territory, poor performance evaluations, criticism in front of co-employees, inquiries about retirement intentions, and expressions of a preference for employees outside of the protected group." Id. at 589.
 {¶ 30} In this case, the University argues that it invited Oleksiak to apply for the director position but that Oleksiak refused. Additionally, the University points out that Oleksiak negotiated the terms of his retirement, continued to work for the University for the remaining school year, and participated in the interview process. In response, Oleksiak maintains that after he learned of Dr. LaGuardia's decision to accept the review committee's recommendations, he asked whether he stood the same chance as other candidates. At one point Oleksiak stated that Dr. LaGuardia's response was, "I guess not," while another time, Oleksiak stated that Dr. LaGuardia's response was, "no." The University's motion for summary judgment does not admit the existence of either statement. Construing the evidence most favorably to Oleksiak, a reasonable trier of fact could conclude that Oleksiak had no choice but to resign, as he stood no chance of maintaining his position as director of OMA. Furthermore, it was not until after this adverse action that Oleksiak began negotiating the terms of his retirement.
 {¶ 31} The appellee relies heavily on Mitchell v. VanderbiltUniversity (6th Cir. Nov. 10, 2004), 389 F.3d 177, for its proposition that there was no adverse employment action against Oleksiak. This reliance is misplaced as the facts in Mitchell are distinguishable from the facts in this case. The district court in Mitchell granted summary judgment in favor of Vanderbilt University because it found that Mitchell failed to allege a materially adverse employment action as required for a claim of age discrimination. The court looked at several occurrences and determined that none constituted adverse employment action. In reaching its conclusion, the court found that the listed occurrences were mere inconveniences, disruptions, alterations of Mitchell's job responsibilities, and threats of adverse employment action and were, therefore, insufficient to satisfy the adverse action requirement. The court pointed out that "`a bruised ego' is simply not enough to constitute an adverse employment action." Id at 182. Additionally, the court found that none of these occurrences had a materially adverse effect on Mitchell's salary and status of employment at Vanderbilt. On the contrary, the court noted that Mitchell remains a tenured member of the Vanderbilt faculty and has not been subject to any reduction in employment benefits.
 {¶ 32} In viewing the facts of the current case in the light most favorable to the non-moving party, we glean the following. Dr. LaGuardia was the ultimate decision-maker with regards to the hiring of a new OMA director. Dr. LaGuardia told Oleksiak that if he applied for the position he would not stand a chance. When faced with no other options, Oleksiak was forced to sign the prepared retirement letter and resign as the director of the OMA. A reasonable trier of fact could conclude that the decision of Dr. LaGuardia to not give Oleksiak a chance if he applied for his current position had a "materially adverse effect" on Oleksiak's salary and status of employment at the University.
 {¶ 33} Furthermore, this court finds this case more compatible with the case of Thompson v. Cuyahoga Community College (May 13, 1999) Cuyahoga App. Nos. 72626, 72627, in which the trial court found that because the parties presented conflicting theories and evidence in their motions for summary judgment, the case was properly submitted to the jury. Ultimately in Thompson, the jury found in favor of Cuyahoga Community College. In the case at bar, the parties allege conflicting theories supported by evidence concerning Oleksiak's departure from the University. Oleksiak argues that he was constructively discharged while the University and Fr. Glynn allege that he retired voluntarily. Accordingly, this court finds that material factual disputes as to whether Oleksiak was constructively discharged demand that this question be resolved by the trier of fact.
 {¶ 34} Assuming Oleksiak has made his prima facie case, the University has met its reciprocal burden. The University alleges that the decision recommended by the OMA review committee was part of an on-going effort to review various departments of the University that were not regularly subject to review, and that Oleksiak's performance as director of the OMA was deficient. Once an employer articulates a legitimate nondiscriminatory reason for its action, the employee must show that reason to be mere pretext for unlawful discrimination. A plaintiff's burden is to then prove that the proffered reason was false and that discrimination was the real reason for the discharge. Wagner v. AlliedSteel Tractor Co. (1995), 105 Ohio App.3d 611, 617.
 {¶ 35} Here, even though the evidence presented by Oleksiak is insufficient to constitute direct evidence of age discrimination, it is sufficient to raise genuine issues of fact as to whether the University's proffered nondiscriminatory reasons are mere pretext. Fr. Glynn repeatedly expressed his desire to see younger individuals in the University's administration. The OMA review committee issued reports containing the students' preference for younger administrators. Additionally, the chairperson of the national search committee seeking Oleksiak's replacement pointed to age as a factor in recommending Dr. Mosley-Anderson.
 {¶ 36} Furthermore, the allegation that Oleksiak's performance as the OMA director was deficient lacks merit. The only evidence in support of this allegation is that Oleksiak did not always keep a paper trail of his work and that he did not consistently review the OMA employees. Additionally, the percentage of minority students attending JCU generally increased during Oleksiak's term as the director of the OMA; since his departure, this percentage has decreased. Construing the evidence in a light most favorable to Oleksiak, a reasonable trier of fact could conclude that the University and Fr. Glynn were motivated by impermissible, discriminatory motives. Therefore, there are material factual disputes that require this question be resolved by the trier of fact.
 {¶ 37} For the reasons stated, we overrule the first assignment of error and affirm the grant of summary judgment as to the claim of reverse race discrimination. We sustain the second assignment of error and reverse the grant of summary judgment as to the claim of age discrimination. The cause is remanded to the Court of Common Pleas for further proceedings.
Judgment affirmed in part and reversed in part.
It is ordered that the parties bear their own costs herein taxed.
This court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Blackmon, A.J., Concurs
 Rocco, J., Concurs in part and dissents in part (see attachedconcurring and dissenting opinion). 2(A)(1).
CONCURRING AND DISSENTING OPINION