OPINION
{¶ 1} Plaintiff-appellant, James L. Coryell ("Coryell"), appeals from the Franklin County Court of Common Pleas' entry of summary judgment in favor of defendants-appellees, Bank One Trust Co., N.A. ("Bank One"), William Natsis ("Natsis"), and John Abunassar ("Abunassar") (collectively, "appellees"), on Coryell's claim of age discrimination. *Page 2 
 {¶ 2} In 1996, Bank One recruited Coryell to serve as its Manager of Retirement Plan and Institutional Trust Services for Ohio and West Virginia. Bank One, which included the Retirement and Custody Services Group, is one of two lines of business within Bank One Investment Management Trust Group (the "Trust Group"). The Trust Group also included Banc One Investment Advisors ("BOIA"), which provided services and advice to institutional clients.
 {¶ 3} Starting in 1996, Coryell was a Senior Vice President within the Retirement and Custody Services Group, which handled the administration and servicing of institutional accounts involving assets subject to trust or other custody requirements. During his tenure, Coryell was active in direct client relationships and assumed full responsibility for all relationships that were threatening litigation due to problems predating Coryell's hire. In 2000, despite his experience handling direct client relationships, Coryell's supervisor, John Alexander, directed that Coryell, as a Client Service Manager, not maintain direct, selective account responsibilities. Accordingly, Coryell transitioned his accounts to individuals within his organization.
 {¶ 4} Also in 2000, the Trust Group reorganized Bank One and BOIA. In the reorganization, BOIA combined its sales and service functions into a single group called the Institutional Asset Management Group ("IAM"). Meanwhile, Bank One divided its accounts into two lines of business based on the size of the accounts. Large corporate accounts ("national accounts"), generally including those with assets of $10 million or more, were delineated from middle market accounts with assets of less than $10 million. In the spring of 2000, Natsis was named Managing Director of Retirement Service and *Page 3 
became Coryell's supervisor. Ultimately, Natsis assumed responsibility for the middle market accounts group.
 {¶ 5} At senior management's request, Coryell created the National Accounts Client Advisory Service Group ("National Accounts Group"), and, in mid-2000, Coryell assumed leadership of it. By the end of 2000, Coryell had recruited a staff of 28 full-time employees. The National Accounts Group was structured so that all Institutional Client Advisors reported directly to Coryell. Coryell managed employment, human resources, and compensation issues for the National Accounts Group, developed client criteria, and identified accounts to be migrated to the National Accounts Group. In late 2000, senior management decided to move the National Accounts Group from Bank One to BOIA and IAM. Coryell supported the move.
 {¶ 6} In January 2001, Natsis informed Coryell that Abunassar, who had recently been named Senior Managing Director of IAM, was considering not taking Coryell with the National Accounts Group when it transferred to IAM. When Coryell contacted him, Abunassar asked Coryell to outline his proposed role in the National Accounts Group. Coryell e-mailed Abunassar on February 1, 2001, detailing his experiences, offering suggestions for transitioning the National Accounts Group into IAM, and explaining his proposed role in the National Accounts Group. As part of his recommendation, Coryell suggested that, after a transition period, his position of national manager eventually be eliminated and that he take on direct client relationships with large, complex clients and serve as a "player-coach" for a subgroup of employees handling large, complex client relationships. On or about February 2, 2001, by telephone, Abunassar told Coryell that he had no position for Coryell in the National *Page 4 
Accounts Group. Abunassar claimed that, because Coryell's position was solely a management position, with no book of business or daily client functions, it did not fit within Abunassar's business model for IAM.
 {¶ 7} Shortly thereafter, during a conference call that Coryell had arranged to inform the National Accounts Group employees that he would not be transferring with them, Abunassar informed the National Accounts Group that John Kozak, an Institutional Client Advisor, was being promoted to Manager of the National Accounts Group, reporting directly to Abunassar. On February 13, 2001, Abunassar announced the completed transfer of the National Accounts Group to IAM, announced Coryell's departure from the National Accounts Group, and named Kozak as Managing Director of National Accounts, Coryell's former title. Abunassar also named another Institutional Client Advisor, Margaret Sparks, Director of one region, reporting directly to Kozak. Abunassar claims that he reassigned Coryell's management functions between Kozak and Sparks and that he, personally, assumed some of Coryell's high-level strategy and planning responsibilities relating to the National Accounts Group. In April 2001, Kozak received a $25,000 increase in base compensation. Also, for the 2002 incentive year, the first in which Kozak was Managing Director of National Accounts, his bonus compensation tripled.
 {¶ 8} Coryell admits that, after Abunassar said there was no position for him, he could have remained on Natsis's payroll for an unspecified time to look for another position, with no guarantees. Natsis did not indicate that he needed to terminate Coryell, and Coryell understood that Natsis would keep him on the payroll "[u]ntil somebody said he couldn't." (Coryell Depo., 179.) Natsis initially offered to help Coryell *Page 5 
obtain another position within the Trust Group, and Coryell interviewed, but was rejected for two open positions. However, Natsis subsequently told Coryell that Abunassar would not hire him and that it was unlikely he would be able to obtain another internal position. Natsis therefore recommended that Coryell take a severance package. Natsis obtained paperwork detailing the severance package from human resources and gave it to Coryell on February 16, 2001. Effective April 1, 2001, the severance package offered by Bank One (not just to Coryell, but to any employee) was to be significantly reduced. After April 1, 2001, the severance package available to Coryell would have included approximately six fewer months of salary and benefits continuation.
 {¶ 9} On February 18, 2001, Coryell suffered a heart attack and went on short term disability leave. Coryell testified that, when his physician released him to return to work in March 2001, he could have rejected the severance package and continued to look for another internal position. However, on March 21, 2001, Coryell accepted the severance package, which provided him 52 weeks of salary and benefits continuation. The severance documents listed Coryell's job elimination date as March 28, 2001, and expressly stated that Coryell could continue to seek a new position with the company. Coryell testified that he believed he had no better option than accepting the severance package, while continuing to look for a new position within the company. Although Coryell did continue to look for an internal position, he ultimately procured an external position during his pay continuation period.
 {¶ 10} Coryell filed this action in the Franklin County Court of Common Pleas on September 24, 2001, alleging a single claim of age discrimination in violation of *Page 6 
R.C. 4112.02(A) and 4112.99. Shortly after answering Coryell's complaint, appellees moved for judgment on the pleadings, arguing that Coryell failed to plead a prima facie case of age discrimination. The trial court granted appellees' motion on January 30, 2002, and this court affirmed the trial court's judgment. See Coryell v. Bank One TrustCo., Franklin App. No. 02AP-191, 2002-Ohio-4443. Holding that an age discrimination plaintiff need only plead a short and plain statement of the claim to plead a prima facie case, the Supreme Court of Ohio reversed and remanded the matter to the trial court. See Coryell v. BankOne Trust Co. N.A., 101 Ohio St.3d 175, 2004-Ohio-723 ("CoryellI"). On remand, discovery proceeded, and appellees moved for summary judgment. The trial court issued a decision granting appellees' motion for summary judgment on August 27, 2007, and issued its final judgment entry on September 12, 2007.
 {¶ 11} Coryell timely appealed and now presents two assignments of error for our review:
 I. THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM OF AGE DISCRIMINATION.
 II. THE TRIAL COURT ERRED IN FAILING TO COMPEL DISCOVERY.
 {¶ 12} In his first assignment of error, Coryell argues that the trial court erred by granting appellees' motion for summary judgment. Appellate review of summary judgment is de novo. Koos v. Cent. OhioCellular, Inc. (1994), 94 Ohio App.3d 579, 588, citing Brown v. SciotoCty. Bd. of Commrs. (1993), 87 Ohio App.3d 704, 711.
 {¶ 13} When an appellate court reviews a trial court's disposition of a summary judgment motion, it applies the same standard as the trial court and conducts an independent review, without deference to the trial court's determination. Maust v. Bank *Page 7 One Columbus, N.A. (1992), 83 Ohio App.3d 103, 107; Brown at 711. We must affirm the trial court's judgment if any grounds the movant raised in the trial court support it. Coventry Twp. v. Ecker (1995),101 Ohio App.3d 38, 41-42.
 {¶ 14} Pursuant to Civ. R. 56(C), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Accordingly, summary judgment is appropriate only where: (1) no genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the non-moving party, reasonable minds can come to but one conclusion, that conclusion being adverse to the non-moving party.Harless v. Willis Day Warehousing Co. (1978), 54 Ohio St.2d 64, 66.
 {¶ 15} "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record before the trial court which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." Dresher v. Burt, 75 Ohio St.3d 280, 292,1996-Ohio-107. Once the moving party meets its initial burden, the non-movant must set forth specific facts demonstrating a genuine issue for trial. Id. at 293. Because summary judgment is a procedural device to terminate litigation, courts should award it cautiously after resolving all doubts in favor of the non-moving party. Murphy v.Reynoldsburg, 65 Ohio St.3d 356, 358-359, 1992-Ohio-95, quotingNorris v. Ohio Std. Oil Co. (1982), 70 Ohio St.2d 1, 2. *Page 8 
 {¶ 16} Coryell brings his age discrimination claim pursuant to R.C. 4112.02, which sets forth unlawful discriminatory practices, and 4112.99, which establishes a cause of action against an employer who engages in unlawful discriminatory practices. In pertinent part, R.C. 4112.02 provides that it shall be an unlawful discriminatory practice:
 (A) For any employer, because of the * * * age * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.
R.C. 4112.99 provides that "[w]hoever violates this chapter is subject to a civil action for damages, injunctive relief, or any other appropriate relief." Relatedly, R.C. 4112.14(A) specifically prohibits age discrimination with respect to hiring and firing and establishes the statutorily-protected class for purposes of age discrimination:
 No employer shall discriminate in any job opening against any applicant or discharge without just cause any employee aged forty or older who is physically able to perform the duties and otherwise meets the established requirements of the job and laws pertaining to the relationship between employer and employee.
 {¶ 17} To prevail on an employment discrimination claim, a plaintiff must prove discriminatory intent. Mauzy v. Kelly Servs., Inc.,75 Ohio St.3d 578, 583, 1996-Ohio-265. With respect to age discrimination claims under R.C. Chapter 4112, the Supreme Court of Ohio has adopted the analytical framework that the United States Supreme Court established inMcDonnell Douglas Corp. v. Green (1973), 411 U.S. 792, a case involving claims of racial discrimination under Title VII of the Civil Rights Act of 1964, Section 2000e, et seq., Title 42, U.S. Code. See Barker v.Scovill, Inc. (1983), 6 Ohio St.3d 146, 147. Under the McDonnellDouglas framework, the plaintiff must first *Page 9 
establish a prima facie case of discrimination. See id. at 147-148. If a plaintiff establishes a prima facie case, the defendant-employer may overcome the inherent presumption of discrimination by articulating a legitimate, non-discriminatory reason for its actions. Id. at paragraph one of the syllabus. Finally, the plaintiff must have the opportunity to show that the defendant's proffered rationale was a pretext for unlawful discrimination. Id.
 {¶ 18} "[A] plaintiff may establish a prima facie case of age discrimination directly by presenting evidence, of any nature, to show that the employer more likely than not was motivated by discriminatory intent." Mauzy at 587. Alternatively, a plaintiff may indirectly prove a prima facie case of age discrimination by presenting evidence of the following: (1) the plaintiff is a member of the statutorily protected class; (2) the plaintiff suffered an adverse employment action; (3) the plaintiff was qualified for the position; and (4) the plaintiff was replaced by a substantially younger person or that a comparable, substantially younger person was treated more favorably. Jelinek v.Abbott Laboratories, 164 Ohio App.3d 607, 2005-Ohio-5696, ¶ 39;James v. Delphi Automotive Sys., Franklin App. No. 04AP-215, 2004-Ohio-5493, ¶ 7; Samadder v. DMF of Ohio, Inc., 154 Ohio App.3d 770,2003-Ohio-5340, ¶ 35; see, also, Coryell I, ¶ 19-20 (modifying the fourth element of the prima facie case to refer to a "substantially younger" person rather than a person outside the statutorily protected class). This test is a descendant of requirements for a prima facie case established in McDonnell Douglas. Coryell I at ¶ 9.
 {¶ 19} On appeal, Coryell argues that the evidence before the trial court demonstrated an indirect, prima facie case of age discrimination and, at least, a *Page 10 
question of fact as to whether appellees' purported reason for allegedly eliminating his position was a pretext for unlawful age discrimination. It is undisputed that Coryell, who was 49 when his employment with Bank One terminated, established the first element of his indirect prima facie case, membership in the statutorily protected class. The trial court also found genuine issues of material fact as to whether Coryell was qualified for the Managing Director position under Abunassar and whether Coryell was replaced by someone substantially younger than himself. However, the trial court found, as a matter of law, that Coryell was neither directly nor constructively discharged because he chose between meaningful options when he accepted the severance package. Finding that Coryell was not discharged, the trial court concluded that he was unable to establish the second element of his prima facie case. Because the trial court granted summary judgment based solely on the second element of Coryell's prima facie case, we focus on that element.
 {¶ 20} In concluding that Coryell failed to meet the second element of his prima facie case, the trial court relied primarily onBarker, in which Jean C. Barker, a 49-year-old secretary, alleged age discrimination under R.C. 4101.17 (the predecessor to R.C. 4112.14).[1] The Supreme Court of Ohio found that Barker did not establish a prima facie case under the statute because she failed to prove that she had been discharged when her position was abolished. Rather, the court found it uncontroverted that Barker voluntarily chose termination with severance pay when faced with three options vis-à-vis her employment. The Supreme Court stated: *Page 11 
 * * * [A]ppellant herein was not only offered both termination with severance pay and layoff options, but was also given the opportunity to transfer to another plant. Indeed, appellant confessed that her refusal to accept the transfer was not based on the inherent undesirability of the offered employ; it was predicated on her belief that she "* * * could duplicate * * * [her] salary some place else." Appellant made a conscious, well-informed, uncoerced decision. She should not now be allowed to cry foul.
Id. at 148.
 {¶ 21} The trial court also relied on Caster v. Cincinnati Milacron,Inc. (May 23, 1990), Hamilton App. No. C-890244, in which the defendant eliminated John T. Caster's position, but maintained Caster, then 58 years old, on the payroll for approximately two months, giving him the opportunity to find another position within the company. When Caster was unable to find a satisfactory position, the employer laid him off and provided him with a negotiated severance package. Caster filed a claim of age discrimination, pursuant to R.C. 4101.17, but the trial court determined that Caster was not discharged and granted summary judgment in favor of the employer. The First District affirmed, stating:
 Although plaintiff stated repeatedly that he was "fired," he acknowledged in his deposition that Milacron gave him three options: (1) the opportunity to obtain other employment with Milacron; (2) "layoff" with twelve weeks' pay, benefits, three years' retention of seniority and recall rights; or (3) permanent "severance" with over $100,000 in payouts, including $51,100.50 in severance pay. Through his attorney, plaintiff selected the third option. The record demonstrates that plaintiff made a conscious, informed and uncoerced decision, and pursuant to Barker * * * the trial court correctly found that plaintiff failed to prove that he had been discharged within the meaning of R.C. 4101.17. * * *
 {¶ 22} Coryell contends that both Barker and Caster are distinguishable and that neither compels the conclusion that he was not discharged. Coryell argues that Barker *Page 12 
is distinguishable because Barker's employer offered her another position within the company in lieu of termination, and thatCaster is distinguishable because Caster received a permanent severance package and did not seek other employment within the company. Despite the factual distinctions between Barker, Caster, and this case, the trial court found that, like Barker and Caster, Coryell had meaningful options when he chose to accept the severance package. Therefore, the trial court concluded that Coryell was not discharged, either expressly or constructively. The court stated: "[N]ot only did Plaintiff receive a full year's pay, with full benefits, he also was able to continue to look for positions within Bank One. And, in fact, Plaintiff did so look within Bank One for a time, but then, of his own volition * * *, Plaintiff stopped seeking positions at Bank One, `pursued other things and found other jobs.'"
 {¶ 23} When a plaintiff chooses termination in lieu of other options, courts will not construe his decision as an actual discharge. Rather, the plaintiff must show that he was constructively discharged, i.e., that his or her choice of termination was involuntary or coerced.Mauzy at 588. Courts generally apply an objective test to determine whether a plaintiff was constructively discharged, asking "whether the employer's actions made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign." Id. at 588-589. In Mauzy, at 589, the Supreme Court explained:
 In applying this test, courts seek to determine whether the cumulative effect of the employer's actions would make a reasonable person believe that termination was imminent. They recognize that there is no sound reason to compel an employee to struggle with the inevitable simply to attain the "discharge" label. No single factor is determinative. Instead, a myriad of factors are considered, including reductions in sales territory, poor performance evaluations, criticism in *Page 13 
front of coemployees, inquiries about retirement intentions, and expressions of a preference for employees outside the protected group. Nor does the inquiry change solely because an option to transfer is thrown into the mix, lateral though it may be. A transfer accompanied by measurable compensation at a comparable level does not necessarily preclude a finding of constructive discharge. * * * A sophisticated discriminating employer should not be permitted to circumvent the statute by transferring an older employee to a sham position as a prelude to discharge. * * *
Coryell contends that a genuine issue of material fact exists as to whether he was constructively discharged, in light of appellees' actions in stripping him of his title and responsibilities, rejecting him for available positions, and advising him that procurement of another position within Bank One was unlikely.
 {¶ 24} Despite the trial court's reliance on Barker for the proposition that the acceptance of a severance package precludes a finding of discharge as a matter of law, other Ohio courts have permitted age discrimination claims on constructive discharge theories under similar circumstances. See Oleksiak v. John Carroll Univ., Cuyahoga App. No. 84639, 2005-Ohio-886 (genuine issue of material fact existed as to whether the plaintiff was constructively discharged even though he signed retirement papers after negotiating additional pay);Scott v. Goodyear Tire Rubber Co. (C.A.6, 1998), 160 F.3d 1121, 1128
(constructive discharge applicable where plaintiff subjectively believed that he would not be recalled if he chose lay-off instead of retirement); Johnson v. Rumsfeld (C.A.6, 2007), 238 Fed.Appx. 105, 109, quoting Scott at 1128 ("choosing retirement when there was `no definite prospect of continued employment with the company' constitutes constructive discharge").
 {¶ 25} In Oleksiak, Ronald Oleksiak, a 68-year-old white male, served as the director of John Carroll University's Office of Multi-Cultural Affairs ("OMA"). After *Page 14 
accepting a recommendation that a national search be conducted to select a new candidate to fill the OMA director position, the university's academic vice president told Oleksiak that he could apply to retain his position. Oleksiak testified that, when he asked whether he stood the same chance as other candidates, the vice president replied, "I guess not" or "no." Oleksiak at ¶ 7. Oleksiak and the vice president then discussed Oleksiak's option to retire. The university agreed to Oleksiak's request for additional pay and benefits at the end of his contract term, and Oleksiak signed a retirement letter, indicating that he agreed with the details of his retirement. Oleksiak continued in his position through the end of his contract term and participated in the process of interviewing candidates for the OMA director position. Ultimately, the university hired an African-American female under the age of 40 as the OMA director, and Oleksiak filed claims of age discrimination and reverse race discrimination, pursuant to R.C. 4112.02(A).
 {¶ 26} On appeal from the trial court's grant of summary judgment in favor of the defendants, the Eighth District noted that only the second element of Oleksiak's prima facie case of age discrimination was at issue. While the defendants argued that Oleksiak could not prove that he was discharged because he signed a retirement letter and did not apply to retain his position, Oleksiak argued that he was constructively discharged because he would not have been given a chance had he applied for the OMA director position. The Eighth District rejected the defendants' argument and found that, "[c]onstruing the evidence most favorably to Oleksiak, a reasonable trier of fact could conclude that Oleksiak had no choice but to resign, as he stood no chance of maintaining his position as director of OMA." Id. at ¶ 30. *Page 15 
 {¶ 27} Here, in support of his contention that he was constructively discharged, Coryell argues that appellees stripped him of his title, position, responsibilities, functions, supervisory role, and involvement in day-to-day operations and management, leaving him with no real position. Abunassar informed Coryell that he would not retain him as Managing Director of the National Accounts Group and informed the National Accounts Group that Kozak would immediately assume management responsibilities. Abunassar also told Coryell that he would not provide him another position in the National Accounts Group. Additionally, Natsis told Coryell that Abunassar was not amenable to Coryell obtaining any internal position related to institutional investment management. Coryell applied for two internal positions prior to accepting the severance package, but he was rejected for both positions. Natsis "highly recommended" that Coryell accept a severance package because Coryell "did not have a position" and because Natsis believed that Coryell would not be able to secure another position within Bank One. (Coryell Affidavit, ¶ 27, 29.) Coryell understood that Natsis saw his own future with Bank One as "uncertain" and that he did not know how long he would be able to maintain Coryell on the payroll. (Coryell Depo., 214.) Moreover, the severance package specifically provided that Coryell could continue to seek a new internal position and, thus, simply guaranteed Coryell a continued salary and benefits while searching for a new position within the organization.
 {¶ 28} We agree with Coryell that this evidence creates a question of fact as to whether Coryell had any meaningful choice but to accept the severance package. Despite appellees' assertions that Coryell could have simply continued on in his employment, the record contains sufficient evidence upon which Coryell could have *Page 16 
believed that termination was imminent. As the Supreme Court of Ohio noted in Mauzy, at 589: "A sophisticated discriminating employer should not be permitted to circumvent the statute by transferring an older employee to a sham position as a prelude to discharge." Here, while appellees did not transfer Coryell, they stripped him of all attributes of his former position, essentially leaving him in a non-existent position. While Coryell remained on Natsis's payroll, he had no title, responsibilities or duties. Given Coryell's understanding of the tenuous nature of Natsis's own continued employment and Natsis's recommendation that Coryell accept the severance package, Coryell could reasonably have believed that termination was imminent should he reject the severance package. The record contains ample evidence that Coryell desired to continue working for the Trust Group and made attempts to find another position within the organization both before and after accepting the severance package, but, in light of comments by Abunassar and Natsis, Coryell could have reasonably believed that he would not be successful in obtaining a new internal position. "[T]here is no sound reason to compel an employee to struggle with the inevitable simply to attain the `discharge' label." Id. Ultimately, viewing the evidence in the light most favorable to Coryell, we find that genuine issues of material fact remain as to whether Coryell was constructively discharged.
 {¶ 29} In addition to arguing that he satisfied the second element of his prima facie case with evidence of constructive discharge, Coryell argues that he was subject to additional adverse actions regarding the terms and conditions of his employment. The trial court did not address Coryell's arguments regarding adverse actions other than discharge, relying on Barker and Caster for the proposition that Coryell was required to *Page 17 
prove discharge in order to make out a prima facie case. However, bothBarker and Caster involved claims under former R.C. 4101.17, which permitted recovery only for an employer's discriminatory failure to hire or termination of an employee. In contrast, R.C. 4112.02 makes actionable a broader range of discriminatory conduct.
 {¶ 30} Although this court has stated that "[t]he `methods for establishing a prima facie case of age discrimination' are the same regardless of whether a claim is brought under R.C. 4112.02 or 4112.14,"Smith v. E.G. Baldwin Assoc, Inc. (1997), 119 Ohio App.3d 410, 414, fn. 1, quoting Byrnes v. LCI Communication Holdings Co.,77 Ohio St.3d 125, 128, 1996-Ohio-307, our statement in Smith does not circumscribe the multitude of discriminatory actions actionable under R.C. 4112.02.Smith involved a discrimination claim based on termination. Thus, the prima facie case of age discrimination was the same under R.C. 4112.14
and 4112.02 because the adverse action at issue was discharge or termination. However, this and other Ohio courts have recognized that a plaintiff may state an actionable claim of discrimination, pursuant to R.C. 4112.02, in the absence of termination. See, e.g.,Samadder at ¶ 39 ("R.C. 4112.02 does not limit claims of discrimination to wrongful discharge or refusal to hire, but, rather, allows claims for discrimination for a broad spectrum of employer actions, including those affecting `hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment'"); Brown v.Dover Corp., Hamilton App. No. C-060123, 2007-Ohio-2128, ¶ 27, quotingHollins v. Atlantic Co., Inc. (C.A.6, 1999), 188 F.3d 652, 662 (a materially adverse action might be indicated by termination, "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material *Page 18 
responsibilities, or other indices that might be unique to a particular situation"); Bhat v. Univ. of Cincinnati, Ohio Ct. of Cl. No. 2000-04723, 2003-Ohio-5623 (although plaintiff did not demonstrate constructive discharge, she established a prima facie case of discrimination based on other adverse actions).
 {¶ 31} Appellees argue that Coryell may not pursue a claim based on adverse actions other than discharge because he did not raise these claims in the trial court. We disagree. In his memorandum in opposition to appellees' motion for summary judgment, Coryell argued that, under R.C. 4112.02, he need not prove that he was discharged and that various adverse actions other than discharge supported his age discrimination claim. For example, Coryell argued that appellees' actions in removing him from his role as Managing Director and reassigning his responsibilities to Kozak adversely impacted the terms and conditions of his employment. While a party may forfeit a claim by failing to raise it at the trial level, that was not the case here. Accordingly, we reject appellees' contention that Coryell may not argue adverse actions other than constructive discharge as the basis of his age discrimination claim.
 {¶ 32} Whether a specific action constitutes an adverse employment action is determined on a case-by-case basis. Tessmer v. Nationwide LifeIns. Co. (Sept. 30, 1999), Franklin App. No. 98AP-1278. Generally, an adverse employment action is defined as a material adverse change in the terms and conditions of employment. Id., citing Kocsis v. Multi-CareMgt., Inc. (C.A.6, 1996), 97 F.3d 876, 885. Employment actions that result only in inconvenience or an alteration of job responsibilities are not disruptive enough to constitute adverse employment actions.Samadder at ¶ 38, citing Peterson v. Buckeye Steel Casings (1999),133 Ohio App.3d 715, 727. *Page 19 
 {¶ 33} Although termination or demotion, coupled with a decrease in salary or material loss of benefits, may indicate an adverse employment action, adverse employment actions are not limited to those situations. In Tessmer, this court noted:
 * * * [A] job transfer resulting in a less distinguished title or significantly diminished responsibilities can constitute an adverse employment action. * * * As well, an employer's decision to transfer an employee to a different department, remove her from her management position, place her under the supervision of the person who took her former management position, assign her less job responsibilities that do not comport with her qualifications and give her negative comments on surprise performance evaluations can be classified as adverse employment actions despite no loss of wages or benefits. * * *
This court found that the Tessmer plaintiff provided sufficient evidence to satisfy the second prong of her prima facie case where the employer abolished the plaintiff's job-share arrangement, stripped the plaintiff from her position and title, reassigned her job duties to younger male employees, and initiated a salary audit that resulted in her position being reclassified to a lower pay band.
 {¶ 34} Similarly, in Bhat, the Court of Claims determined that the plaintiff demonstrated an adverse employment action where the University of Cincinnati removed her titles of director of cardiac transplantation and director of the heart failure program, despite maintaining her as a full professor with no loss of pay or benefits. The court found that the loss of the "director" titles had a significant effect on the plaintiff's status; "[s]he lost not only the prestige associated with the director's title, but also the level of responsibility and the perception of her professional capabilities associated with those roles." Id. at ¶ 17. Although the court found that the employer's actions failed to *Page 20 
demonstrate constructive discharge, it determined that the plaintiff nevertheless established a prima facie case of age discrimination.
 {¶ 35} We find that Coryell has presented evidence from which reasonable minds could conclude that he was subjected to adverse employment actions, as required to establish the second prong of his prima facie case. Abunassar's decisions not to retain Coryell as Managing Director of the National Accounts Group, to reassign Coryell's management and supervisory responsibilities to Kozak, Coryell's former subordinate, and to not provide Coryell another position within the National Accounts Group had a materially adverse effect on the terms and conditions of Coryell's employment. Although Coryell technically remained employed, with no loss of salary or benefits, after Abunassar removed him from his position as managing director, Abunassar's actions left Coryell with no title, no authority, no responsibilities, and limited prospects of continued employment. At a minimum, appellees contend that they eliminated Coryell's position. Such an action had an adverse effect on the terms of Coryell's employment.
 {¶ 36} Collectively considering the circumstances surrounding the removal of Coryell from his position as managing director, we conclude that the trial court erred in determining, as a matter of law, that Coryell failed to satisfy the second element of his prima facie case for age discrimination. Accordingly, having determined that genuine issues of material fact precluded summary judgment on the other elements of Coryell's prima facie case, the trial court erred in determining, as a matter of law, that Coryell failed to establish a prima facie case. *Page 21 
 {¶ 37} The trial court's analysis ended with its conclusion that Coryell failed to establish a prima facie case. However, we proceed through the Barker burden shifting analysis to determine whether summary judgment was nevertheless warranted.
 {¶ 38} If a plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the employer to articulate some legitimate, non-discriminatory reason for its actions.Barker at 148. Appellees offered a single reason for removing Coryell from his position as Managing Director and not transferring him to IAM with the National Accounts Group. Appellees contend that Coryell did not fit within Abunassar's "player-coach" vision for the manager of the National Accounts Group because he did not have his own book of business. Based on Abunassar's deposition testimony, we find that appellees met their burden of articulating a non-discriminatory reason for removing Coryell from his position as Managing Director of the National Accounts Group and not transferring Coryell with the group.
 {¶ 39} Having determined that appellees met their burden of articulating a non-discriminatory reason for their actions, we consider whether Coryell presented evidence demonstrating a genuine issue of material fact as to whether appellees' asserted reason was a pretext for age discrimination. Once a defendant produces sufficient evidence to support a non-discriminatory reason for its action, the plaintiff has the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Texas Dept. of Community Affairsv. Burdine (1981), 450 U.S. 248, 253, citing McDonnell Douglas at 804. To establish pretext and that he or she was the victim of intentional discrimination, a plaintiff may make a direct showing that a discriminatory reason motivated the *Page 22 
employer's action or an indirect showing "that the employer's proffered explanation is unworthy of credence." Burdine at 256. Thus, "[t]o defeat a motion for summary judgment, [a plaintiff] must point to some evidence from which a reasonable fact finder could reasonably: (1) disbelieve the employer's articulated legitimate reasons, or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's actions." Hoyt v. Nationwide Mut.Ins. Co., Franklin App. No. 04AP-941, 2005-Ohio-6367, ¶ 67, citingFuentes v. Perskie (C.A.3, 1994), 32 F.3d 759, 764.
 {¶ 40} With respect to a plaintiff's burden of establishing pretext, the United States Supreme Court has held:
 "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination." * * *
(Emphasis sic.) Reeves v. Sanderson Plumbing Prods., Inc. (2000),530 U.S. 133, 147, quoting St. Mary's Honor Ctr. v. Hicks (1993),509 U.S. 502, 511.
 {¶ 41} The trier of fact may consider the evidence establishing the plaintiff's prima facie case, along with inferences drawn from that evidence, in deciding whether the employer's proffered reasons are pretextual. Reeves at 143. A fact finder's disbelief of the employer's articulated reason does not compel judgment for the plaintiff. Before a plaintiff is entitled to judgment, the fact finder must not only disbelieve the employer, but must also believe the plaintiff's explanation of discrimination. Reeves at 147, citing Hicks at 519. However, "[i]n appropriate circumstances, the trier of fact can *Page 23 
reasonably infer from the falsity of the [employer's] explanation that the employer is dissembling to cover up a discriminatory purpose."Reeves at 147. Thus, a plaintiff need not always introduce independent evidence of discrimination to show pretext where there is sufficient evidence to reject the employer's explanation. Id. at 148; Peters v.Lincoln Elec. Co. (C.A.6, 2002), 285 F.3d 456, 470.
 {¶ 42} On summary judgment, appellees argued that their actions regarding Coryell's position and employment were the result of Abunassar's business decisions and that the court should not substitute its judgment for the employer's judgment. Generally, in a discrimination case, courts should not second guess an employer's business judgment concerning personnel decisions. McKenzie v. Wright State Univ. (1996),114 Ohio App.3d 437, 442. However, an employer's business decision is not an absolute defense to unlawful discrimination. Wexler at 576. Rather, a court may consider the reasonableness of an employer's decision to the extent that such an inquiry sheds light on whether the employer's proffered reason actually motivated the employer's actions. Id., citing Smith v. Chrysler Corp. (C.A.6, 1998), 155 F.3d 799, 807; See, also, Loeb v. Textron, Inc. (C.A.1, 1979), 600 F.2d 1003, 1012, fn. 6 ("The reasonableness of the employer's reasons may of course be probative of whether they are pretexts. The more idiosyncratic or questionable the employer's reason, the easier it will be to expose it as a pretext.").
 {¶ 43} Here, we find sufficient evidence from which reasonable minds could disbelieve appellees' proffered reason for removing Coryell from his position as Managing Director of the National Accounts Group. First, only months before Abunassar removed Coryell from his position, Coryell was selected to create and lead *Page 24 
the National Accounts Group, based on his relevant experience and knowledge. All evidence suggests that Coryell was successfully performing his role of Managing Director, and Abunassar admitted that he had no issues with Coryell's performance. In his affidavit, Coryell states: "Natsis admitted that I should manage the [National Accounts Group under Abunassar], as I was the most qualified." (Coryell Affidavit, ¶ 17.) Natsis testified that Coryell had been successful at Bank One, demonstrated technical knowledge, and was liked and supported by his subordinates.
 {¶ 44} Second, while Abunassar desired the National Accounts Group manager to maintain a book of business, there is no dispute that Coryell's experience qualified him to resume direct client relationships. Until shortly before embarking on the creation of the National Accounts Group, Coryell successfully maintained a book of business, which he gave up at the direction of his former supervisor who, in direct contrast to Abunassar's business model, prohibited managers from maintaining books of business. Moreover, Coryell was willing and qualified to resume direct client relationships and suggested to Abunassar that he resume direct relationships and serve as a "player-coach," the very term Abunassar uses to describe his vision of the Managing Director role. The record contains evidence that certain accounts had not yet been transitioned to National Accounts Group employees, and the National Accounts Group organizational chart shows open Institutional Client Advisor positions, suggesting the availability of accounts for which Coryell could have assumed direct responsibility. Abunassar also admitted that, if he had wanted to assign Coryell accounts, he could have done so through the open investment relationship manager position for which Coryell interviewed, but was rejected. Such evidence discredits Abunassar's refusal to *Page 25 
assign Coryell a book of business based on his reluctance to transition clients where unnecessary. Viewing the evidence in the light most favorable to Coryell, we find that a fact finder could reasonably disbelieve appellees' purported non-discriminatory reason for their actions relating to Coryell's position and employment.
 {¶ 45} In Reeves, at 148, the United States Supreme Court recognized that proof that a defendant's reason is unworthy of credence will notalways be adequate to sustain a finding of liability; "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory," like, for example, where "the record conclusively revealed some other, nondiscriminatory reason for the employer's decision." However, concurring in that case, Justice Ginsberg recognized the uncommon nature of cases where an employer would be entitled to judgment as a matter of law despite evidence demonstrating both a prima facie case of discrimination and that the employer's explanation of its actions was false:
 * * * [E]vidence suggesting that a defendant accused of illegal discrimination has chosen to give a false explanation for its actions gives rise to a rational inference that the defendant could be masking its actual, illegal motivation. * * * [T]he inference remains — unless it is con clusively demonstrated * * * that discrimination could not have been the defendant's true motivation. If such conclusive demonstrations are (as I suspect) atypical, it follows that the ultimate question of liability ordinarily should not be taken from the jury once the plaintiff has introduced the two categories of evidence described above. * * *
Reeves at 154-155 (Ginsburg, J., concurring). Here, the record does not conclusively reveal another non-discriminatory reason for appellees' actions. *Page 26 
 {¶ 46} Because the fact finder's disbelief of appellees' proffered non-discriminatory reason, coupled with evidence satisfying Coryell's prima facie case, would permit (although not compel) the fact finder to infer the ultimate fact of intentional discrimination, we find that appellees are not entitled to judgment as a matter of law on Coryell's age discrimination claim. We do not suggest that Coryell will or should ultimately prevail on his age discrimination claim, but conclude only that the evidence, viewed in the light most favorable to Coryell, creates genuine issues of material fact, which preclude summary judgment. Accordingly, we find that the trial court erred in granting summary judgment in favor of appellees, and we sustain Coryell's first assignment of error.
 {¶ 47} In his second assignment of error, Coryell argues that the trial court erred in failing to compel discovery. A trial court enjoys broad discretion in the regulation of discovery, and an appellate court will not reverse a trial court's decision to sustain or overrule a motion to compel discovery absent an abuse of discretion. 513 East RichSt. Co. v. McGreevy, Franklin App. No. 02AP-1207, 2003-Ohio-2487, ¶ 10. Such a standard of review requires this court to affirm the trial court's action absent a showing that the court acted unreasonably, unconscionably or arbitrarily. See, e.g., Berk v. Matthews (1990),53 Ohio St.3d 161, 169.
 {¶ 48} On October 12, 2004, Coryell originally filed a motion to compel discovery, which the trial court granted on March 11, 2005, ordering appellees to fully respond to Coryell's discovery requests and to state specifically any remaining objections. Thereafter, appellees supplemented their answers to Coryell's interrogatories, provided additional responsive documents, and made requested personnel documents available. *Page 27 
Coryell filed a second motion to compel, along with a motion for sanctions, on August 12, 2005, arguing that, even with their supplemental responses, appellees had not fully responded to Coryell's discovery requests. In response, appellees claimed that they had fully complied with Coryell's discovery requests and that Coryell did not identify any specific document or information responsive to his discovery requests that they failed to produce.
 {¶ 49} On September 21, 2005, Coryell filed a 31-page memorandum in opposition to appellees' motion for summary judgment. In his memorandum in opposition, Coryell stated that "[appellees'] failure to produce discovery has substantially interfered with plaintiff's ability to provide a complete response to [appellees'] Motion for Summary Judgment" and that "once discovery is provided there will be even more evidence supporting the denial of [appellees'] Motion for Summary Judgment." However, Coryell did not request a continuance to obtain additional discovery necessary to respond to appellees' motion for summary judgment.
 {¶ 50} Whether, by his second assignment of error, Coryell argues that the trial court abused its discretion by ruling on appellees' motion for summary judgment without first ruling on Coryell's second motion to compel or by failing to grant his motion to compel on the merits, we find these arguments moot. Given our determination that the trial court erred in granting summary judgment and the necessity of remand for further proceedings, any argument regarding the court's ruling on the motion for summary judgment prematurely is moot. Moreover, on remand, the trial court may yet rule on Coryell's discovery motion, thus rendering moot any argument regarding the merits of *Page 28 
the motion to compel. Accordingly, we overrule Coryell's second assignment of error as moot.
 {¶ 51} Having sustained Coryell's first assignment of error and overruled Coryell's second assignment of error as moot, we reverse the judgment of the Franklin County Court of Common Pleas and remand this matter to the trial court for further proceedings consistent with this opinion and the law.
Judgment reversed and cause remanded.
BROWN and SADLER, JJ., concur.
[1] R.C. 4101.17(A) provided that: "No employer shall discriminate in any job opening against any applicant or discharge without just cause any employee aged forty or older who is physically able to perform the duties and otherwise meets the established requirements of the job and laws pertaining to the relationship between employer and employee." *Page 1