[Cite as *Glemaud v. MetroHealth Sys.*, 2018-Ohio-4024.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 106148

# YVENS GLEMAUD

PLAINTIFF-APPELLANT

vs.

# METROHEALTH SYSTEMS

DEFENDANT-APPELLEE

## JUDGMENT:
### AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-15-839393

**BEFORE:** Boyle, J., McCormack, P.J., and Stewart, J.

**RELEASED AND JOURNALIZED:** October 4, 2018

[Cite as *Glemaud v. MetroHealth Sys.*, 2018-Ohio-4024.]

**ATTORNEYS FOR APPELLANT**

Robert V. Housel
23240 Chagrin Boulevard, Suite 101
Beachwood, Ohio    44122

Richard C. Alkire
Alkire & Nieding, L.L.C.
200 Spectrum Building
6060 Rockside Woods Boulevard
Independence, Ohio    44131-2335

Paul W. Flowers
Louis E. Grube
Paul W. Flowers Co., L.P.A.
Terminal Tower, Suite 1910
50 Public Square
Cleveland, Ohio    44113


**ATTORNEYS FOR APPELLEE**

Jon M. Dileno
Ami J. Patel
Zashin & Rich Co., L.P.A.
950 Main Avenue, 4th Floor
Ernst & Young Tower
Cleveland, Ohio    44113

MARY J. BOYLE, J.:

{¶1}    Plaintiff-appellant, Yvens Glemaud, M.D., appeals from a trial court's order granting summary judgment to defendant-appellee, the MetroHealth System ("MetroHealth").   Dr. Glemaud raises one assignment of error for our review, namely, that "[t]he trial court erred as a matter of law by granting summary judgment against [him]."   After review, we find no merit to Glemaud's arguments and affirm the trial court's decision.

## I. Procedural History and Factual Background

{¶2}    Glemaud originally filed this action in November 2012, alleging racial and national origin discrimination, specifically disparate treatment, under R.C. 4112.02(A), which provides that it shall be an unlawful discriminatory practice:

> For any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

{¶3}    Glemaud sought relief for his discrimination claims under R.C. 4112.99, which states that "[w]hoever violates this chapter is subject to a civil action for damages, injunctive relief, or any other appropriate relief."   Glemaud voluntarily dismissed his case without prejudice on September 8, 2014, and refiled it on January 23, 2015.

{¶4}    MetroHealth moved for summary judgment in May 2017.   Glemaud

opposed MetroHealth's motion. The following facts come from the parties' summary judgment motions, responses, and their attached exhibits.[1]

{¶5} Glemaud was born in Haiti. He moved with his family to Brooklyn, New York when he was seven years old. He became a U.S. citizen while he was still in high school.

{¶6} Glemaud majored in laboratory science as an undergraduate at Hunter College. He agreed in his deposition that he did "poorly" in his science and math classes at Hunter College.

{¶7} Glemaud applied to medical schools in the United States but did not get into any of them. As a result, he applied to medical schools in the Caribbean and was accepted to Ross University School of Medicine in the Commonwealth of Dominica. Based on his poor performance at Ross, he transferred after one year to American

---

[1]We want to point out that in his brief to this court, Glemaud states that "[d]uring the summary judgment proceeding below, the parties freely cited to the depositions that had been filed in the earlier action without objection." While this may be true, MetroHealth attached excerpts of each deposition transcript from the earlier case. Glemaud, however, cites to the earlier depositions in his summary judgment motion without attaching the relevant excerpts from the transcripts. Thus, many of the facts in Glemaud's summary judgment motion and appellate brief are not in the record before us because a majority of the earlier depositions are not in the record on appeal. It is an appellant's duty to ensure that the record contains all that is necessary for the reviewing court to determine the appeal. *See Rose Chevrolet, Inc. v. Adams*, 36 Ohio St.3d 17, 19, 520 N.E.2d 564 (1988) ("[W]here a transcript of any proceeding is necessary for disposition of any question on appeal, the appellant bears the burden of taking the steps required to have the transcript prepared for inclusion in the record. *Knapp v. Edwards Laboratories* (1980), 61 Ohio St.2d 197, 400 N.E.2d 384. Any lack of diligence on the part of an appellant to secure a portion of the record necessary to his appeal should inure to appellant's disadvantage rather than to the disadvantage of appellee.").

University of the Caribbean School of Medicine located in St. Maarten. He graduated in the bottom 20th percentile of his medical school class from American University.

{¶8} Glemaud applied to MetroHealth's residency program in late 2006. MetroHealth offered Glemaud a one-year residency contract in the family medicine department that began on July 1, 2007, and was scheduled to end on June 30, 2008.

{¶9} Residents at MetroHealth rotate through different one-month modules within the department of family medicine. After orientation, Glemaud began his rotation in "telemetry," which involved assessing patients with heart issues. During this rotation, Glemaud received mostly positive evaluations and comments from his supervising doctors.

{¶10} On August 24, 2007, Glemaud moved to the family medicine inpatient services ("IPS") rotation, which was scheduled to end on September 20, 2007. During this rotation, Glemaud's supervising doctors, Dr. Julia Bruner, Dr. Bode Adebambo, and Dr. Laura Hallak, spoke with Glemaud about the problems that he was having with his performance and the areas where he needed to improve. These same supervising doctors also spoke with Dr. Heidi Morris, the vice chair of the department and program director of the residents, about Glemaud's performance issues. On September 20 and 21, Dr. Bruner, Dr. Adebambo, and Dr. Hallak emailed Dr. Morris about Glemaud's performance during the rotation, memorializing their concerns.

{¶11} Dr. Hallak stated that Glemaud was good at talking to patients and that patients seemed to like him, but that he needed "to know the patients better" and "needs

to bring cards to rounds with patient information." She further stated that Glemaud needed to be faster at admitting and discharging patients. Most importantly, Dr. Hallak stated that Glemaud needed to "have a plan for his patients" and write more complex patient notes. She believed that "one more IPS rotation" would make him a stronger resident.

{¶12} Dr. Adebambo told Dr. Morris that Glemaud's presentations were disorganized. Specifically, she stated that Glemaud did not seem to be aware of all of the patient's problems when he was presenting. She also felt that his notes were "scanty" and did not address "all of the problems as well as often minimal or no assessment of plan of care." She said that she discussed these issues with Glemaud and gave him a "plan of action" that included "reading up on all diagnosis of patients he took care of, discussing each patient with the senior admitting resident and IPS seniors, asking for help," and having a reading list of common IPS problems. She also recommended that Glemaud come to work early to get a "better grasp of his patients before rounds rather than having incomplete information." Finally, Dr. Adebambo recommended "continued assessment" of Glemaud's performance to ensure that he was following the recommendations. She stated that Glemaud "seemed pretty open to feedback" and was going "to work on these issues."

{¶13} Dr. Bruner stated in an email to Dr. Morris and Dr. Aphrodite Papadakis, the assistant program director, that Glemaud's notes "required more detailed information." She said that his notes were lacking in patient assessments, differential diagnosis, and

patient planning.   She had difficulty assessing Glemaud's "knowledge base" due to his lack of "assessments and independent medical planning."   Dr. Bruner further indicated that there was an incident related to a patient with chest pain and that a "teaching intervention was done" with Glemaud.   Dr. Bruner would not fail Glemaud, but felt that "close one on one educational sessions would help him tremendously."

{¶14} Based upon conversations with Drs. Bruner, Adebambo, and Hallak, as well as their respective email reports regarding Glemaud's performance during the first IPS rotation, Dr. Morris decided to put Glemaud on a "plan of action" and make him repeat the rotation.

{¶15} In a memorandum dated September 21, 2007, Dr. Morris informed Glemaud of her decision, i.e., that he would have to follow a "plan of action" and complete another rotation of IPS.   Dr. Morris explained in the memo that "several concerns" had been raised by "faculty regarding his performance on Family Medicine IPS Service."   She stated that she had been informed by Drs. Forde (Glemaud's advisor), Adebambo, and Bruner that he was "struggling with [his] patient management."   Dr. Morris told Glemaud that in order to gauge his performance, she was requiring him to (1) meet weekly with his advisor to review a specific reading list that address common topics seen in family medicine, (2) subscribe to a monthly publication called "Core Content Review," (3) test at the 15 percent or greater on the upcoming in-training examination, (4) be prepared for all patient presentations, both in the morning report as well as on rounds, (5) report any difficulty as it arises, (6) discuss every patient with "IPS seniors" on a daily

basis, and (7) come in early so that he had a "solid grasp of knowledge" of his patients, which was "to be done in conjunction with maintaining the 80 hour work week."

{¶16} Dr. Morris and Joshua Rosko, a staffing specialist under Dr. Morris, met with Glemaud that same day, September 21, to present the memo to him, tell him that he had to repeat the IPS rotation, and give him the "plan of action." Dr. Morris told Glemaud that he was not being disciplined and that the meeting was just to help him succeed in the residency program. Dr. Morris said that rather than accept constructive criticism and attempts to help him, Glemaud got very angry. Dr. Morris stated that during this meeting, Glemaud actually rose from his chair and "lurched forward" at her. She said that she had never before or since had a resident "demonstrate that type of anger" toward her.

{¶17} Rosko attended all meetings with Dr. Morris. Rosko said that when Dr. Morris told Glemaud that he had to repeat the module, he was "very offended" and got defensive and "exhibited signs of extreme anger." According to Rosko's notes from the September 21 meeting, Glemaud agreed with the "plan of action," but did not agree that his performance was lacking. Glemaud signed the letter, but expressed "vehement disagreement on the basis of the meeting."

{¶18} Dr. Papadakis was the attending physician for the IPS rotation and, as such, Glemaud's supervisor from September 27 to October 3. Dr. Papadakis notified Dr. Morris of several serious issues that arose with Glemaud's patient care between September 27 and October 1. Dr. Papadakis documented these concerns in a

"narrative."[2]   Some of her concerns included the fact that Glemaud told Dr. Papadakis that a patient was on a particular medication when she was not.   Dr. Papadakis explained that this "incorrect information during rounds seriously jeopardizes patient safety." According to Dr. Papadakis, Glemaud also did not know why a complicated patient had a "fresh surgical wound" bandaged on her abdomen, which was "unacceptable and unsafe." Finally, Dr. Papadakis described an incident where Glemaud claimed to have seen a patient in the morning and had even "reported on her vitals and the status of her leg laceration," but the patient later complained that no doctor had been to see her yet that day.

{¶19} Due to these serious issues, Dr. Morris decided to place Glemaud on a remediation plan and require him to seek assistance from the hospital's employee assistance program ("EAP").   Dr. Morris scheduled a meeting with Glemaud for October 1, 2007.   Rosko and Dr. Papadakis also attended the meeting.   Dr. Morris, Dr. Papadakis, and Rosko all contend that Glemaud did not want to go to the EAP and became very angry, defensive, and argumentative.

{¶20} Rosko's notes from this meeting show that Drs. Morris and Papadakis explained the serious concerns they had with Glemaud's performance and that "there need[ed] to be a plan in place right away."   Rosko noted that Glemaud got defensive and denied that he had anger issues.   Glemaud wanted to know the names of the people

---

[2]Dr. Papadakis did not document these concerns until October 8, 2007.

accusing him of having "angry outbursts." Dr. Morris told Glemaud to finish his notes, go home, and come back the next day for a referral to the EAP program.

{¶21} Approximately five minutes after the October 1 meeting, Dr. Papadakis went to the resident's lounge to meet with another resident, Dr. Escandon. According to Dr. Papadakis, she found Dr. Escandon talking to Glemaud by the vending machines. Dr. Papadakis said that she said good night to Glemaud and began walking with Dr. Escandon. While Dr. Papadakis and Dr. Escandon were walking, Dr. Papadakis saw Glemaud come out from a dead-end hallway and start walking about one to two feet behind her and Dr. Escandon without saying a word to them. Drs. Papadakis and Escandon turned left toward the elevator, and Glemaud continued walking straight. Glemaud claims that he was trying to exit the building, but does not deny that he was walking closely behind Drs. Papadakis and Escandon.

{¶22} Dr. Papadakis immediately told Dr. Morris about the incident. She thought that Glemaud's behavior was extremely "bizarre." Dr. Morris advised Dr. Papadakis to file a report with hospital security, which Dr. Papadakis said she did. MetroHealth security, however, does not have any documentation of this report. Dr. Papadakis said that she also requested MetroHealth security to walk her to her car that evening when she left the hospital.

{¶23} Dr. Morris decided to suspend Glemaud the following morning. Glemaud was scheduled to meet with Dr. Morris at 9:00 a.m. on October 2. Dr. Morris prepared a suspension letter, informing Glemaud that he was being suspended for "behavior" and his

"provision of medical care." In the letter, she advised him that he had to undergo a psychiatric evaluation and drug testing during the suspension. She also informed him that he had a right to appeal within five days under the due process policy of the hospital.

{¶24} Before the October 2 meeting, Dr. Morris called hospital security to warn them that there might be an issue with Glemaud that morning because she was suspending him for "following and harassing" Dr. Papadakis.

{¶25} On the morning of October 2, Glemaud went to see Bruce Reimer, MetroHealth's manager of employee and labor relations, before going to see Dr. Morris. Glemaud told Reimer that he believed he was being discriminated against because of his race. While there, Glemaud received a page from Rosko telling him that Dr. Morris wanted to see him immediately, so Glemaud left Reimer's office to meet with Dr. Morris.

{¶26} When Glemaud arrived to the family medicine conference room, Dr. Morris was there with Rosko and Dr. Forde. Glemaud said that he felt ill, so he stepped into a nearby restroom. Rosko reported that Glemaud was acting strange, going in and out of the restroom with his briefcase. Rosko said that he was worried that Glemaud was going to hurt himself. Dr. Morris described Glemaud's actions as "very odd behavior," so she decided to push the panic button. Before the security officers arrived, Glemaud complained of chest pains. Dr. Morris wanted Glemaud to go to the emergency room, but he refused. When the security officers arrived, Glemaud claims Dr. Morris grabbed

him and said, "come on nigger, hit me," and "you know you want to do that." Dr. Morris denies that she said this. There were three security officers standing near Dr. Morris and Glemaud at the time. None of them heard Dr. Morris call Glemaud a racial slur or say "hit me." Rosko was also standing close by, and he did not hear Dr. Morris say any racial slurs. Glemaud said that he tried to move away from Dr. Morris, but she grabbed him more forcefully. Security officers then escorted Glemaud to the emergency room.

{¶27} Emergency room doctors said that Glemaud had an anxiety attack. While in the emergency room, Dr. Emerman, MetroHealth's designated institutional official, recommended to Glemaud that he be tested for drugs. Glemaud states that he told Dr. Emerman at that point in the emergency room that Dr. Morris called him a racial slur, but Dr. Emerman denies that Glemaud ever told him this. Glemaud was released after a few hours.

{¶28} Later that same night, Glemaud submitted a handwritten complaint to MetroHealth's human resources department, alleging that he was being discriminated against because of his race. Glemaud did not state in the complaint that Dr. Morris called him a racial slur. He stated that he "firmly" believed Dr. Morris was discriminating against him because of his race.

{¶29} The following day, on October 3, Dr. Morris gave Glemaud the suspension letter that she had prepared for him on the previous day. Glemaud appealed his suspension on October 4.

**{¶30}** Dr. Papadakis wrote a narrative on October 8, summarizing the concerns that she had about Glemaud's performance and behavioral issues. As part of this narrative, Dr. Papadakis explained:

> Following our meeting with Dr. Glemaud on Monday, October 1, 2007, I left the administrative area to return to the medical floors. I came upon Dr. Glemaud and Dr. Escandon leaving the resident lounge. I said good night to Dr. Glemaud and began to walk with Dr. Escandon to the medical floors because we needed to meet with a family together. Dr. Glemaud proceeded to walk behind us. Dr. Escandon and I stopped in a vending area for a moment and Dr. Glemaud continued walking. Dr. Escandon and I stepped out of the vending area and continued down the hallway towards the patient care area. Out of the corner of my eye I saw Dr. Glemaud step out from a side hallway and again begin to walk behind us. He did not say anything. He continued to walk behind us until we made a left turn towards the hospital elevators. The hallway from which he stepped out was blocked off for construction and was essentially a dead-end hallway. I felt very uncomfortable and unsafe for the remainder of the evening. Late that evening when I left the hospital I asked security to escort me to my office and vehicle. I filed a report with Metro security.

**{¶31}** During his suspension over the next three weeks, Glemaud saw two psychiatric doctors in New York. Both doctors cleared him to return to work.

**{¶32}** Glemaud's three-week suspension ended on October 23, 2007. Dr. Morris prepared a remediation plan for Glemaud's return to work. She, Dr. Emerman, and Dr. Forde presented it to him that day. Dr. Morris told Glemaud that the remediation plan was mandatory and would be in effect for 90 days. She further stated that the plan was "in response to concerns regarding [his] clinical performance while on the Family Medicine Inpatient Service." Dr. Emerman said that when they presented the October 23, 2007 remediation plan to Glemaud, he got angry again rather than focus on the "issues

at hand." Glemaud signed the plan, however, acknowledging receipt of it. And although two doctors in New York had cleared Glemaud to come back to work, he did not. Instead of returning to work, Glemaud sent a letter to Dr. Emerman on October 24, 2007, informing him that he did not believe the remediation plan was fair or reasonable. Glemaud said that he found the plan "impossible to accept and adhere to" and that it "was designed for [him] to fail."

{¶33} On October 25, 2007, Dr. Morris sent a certified letter to Glemaud, informing him that MetroHealth had removed his three-week suspension and would now consider it "leave with pay." MetroHealth also cancelled Glemaud's due process hearing (that he had requested on October 4) after removing the suspension. Dr. Morris further informed Glemaud that before he returned to work, he needed to "provide documentation from [his] physician as to [his] present illness explaining [his] time away beginning October 24, 2007, and [his] ability to return to work."

{¶34} On October 29, 2007, Glemaud submitted a typed discrimination complaint to MetroHealth's human resources department, alleging that he had been discriminated against due to his color, race, and national origin. Bruce Reimer conducted an investigation into Glemaud's allegations. He found that Glemaud's claim could not be substantiated.

{¶35} Despite the two New York doctors clearing him to go back to work in October, Glemaud gave a letter to MetroHealth from Dr. Lee Horowitz on November 7, 2007, stating that Glemaud was not ready to return to work because he was "not able to

successfully perform his duties according to the specifications outlined for him in the remediation plan dated October 23, 2007." Dr. Horowitz further stated that Glemaud "needs further treatment before attempting to return to work."

{¶36} On January 13, 2008, Dr. Horowitz sent a letter to MetroHealth stating that he had been treating Glemaud for "acute anxiety" for the past two months and that he now felt that Glemaud was ready to return to work. Dr. Horowitz further opined that although Glemaud had made "good progress," he was "not fully over his anxiety and it would be helpful in his recovery if he were given some consideration with regard to fulfilling the specifications outlined in the remediation plan * * * put forth."

{¶37} Dr. Morris, Reimer, and Rosko met with Glemaud to discuss his return to work. They informed him that he would have to sign a "return to work agreement," participate in a remediation plan, and undergo a psychological "fitness for duty" exam before returning to work.

{¶38} On January 23, 2008, Dr. Morris sent an email to Dr. Emerman, warning him that she believed that Glemaud "was a danger" to patients, staff, residents, and faculty "given what [she] had observed."

{¶39} Glemaud was subsequently examined for "fitness for duty" by Dr. Robert Smith, a clinical psychologist chosen by MetroHealth. Dr. Smith frequently handled fitness for duty exams for MetroHealth. On January 27, 2008, Dr. Smith found that Glemaud was fit to resume his duties as a resident. Due to ongoing issues, however, Dr. Smith recommended that Glemaud continue to work with Dr. Horowitz at least once

every two weeks to address his "anxiety, low self-esteem, and fear of failure" issues, and to comply with all treatment recommendations. Dr. Smith further recommended that Glemaud meet with the EAP and his supervisors to discuss the conditions of his return to work.

{¶40} Dr. Morris sent the remediation plan that she had created for Glemaud to Terry Leigh, vice president of examination, administration, and credentials at the American Board of Family Medicine. She asked Leigh to review the remediation plan. On March 6, 2008, Leigh sent an email to Dr. Morris, stating that the remediation plan was "very comprehensive and well delineated." Leigh's "only concern" was the lack of objective criteria to "grade" Glemaud's progress. Leigh suggested that Dr. Morris "delineate as completely as possible all of the factors that will be used to determine a grade of 'pass,'" and recommended that Dr. Morris explain what she expected on each of the requirements.

{¶41} Dr. Morris, however, did not implement any of Leigh's recommendations. She stated that she felt "that the points that [Leigh] wanted her to include were so basic that they went back to medical school, such as what would have been included in a SOAP note. That's very basic, that goes back to medical school 101. Subjective, objective, assessment, and plan."

{¶42} On March 10, 2008, Reimer, Dr. Morris, and Rosko presented Glemaud with the remediation plan and a "Return to Work Agreement." The agreement stated that based on Dr. Smith's evaluation, Glemaud would only be permitted to return to his

position as a resident if he: (1) complied with the 90-day remediation plan, (2) agreed to "call first or have a scheduled appointment" before entering the administrative offices of Dr. Morris or Dr. Papadakis during the plan and during his residency in family medicine, (2) continued to work with Dr. Horowitz once every two weeks and comply with all treatment recommendations, (3) agreed to contact and work with the EAP and authorize representatives from the EAP "to obtain ongoing information about his participation in therapy," (4) executed a release of information to permit representatives of EAP to obtain ongoing information about his participation in therapy, (5) "execute[d] a release of information to permit representatives of EAP to contact his mental healthcare provider directly so that EAP may monitor his compliance with the terms of the agreement," (6) "execute[d] a release to allow EAP to share any and all treatment information" with his supervisors, and (7) agreed to periodically meet with representatives of the EAP and cooperate with them.

**{¶43}** The agreement further stated that failure to comply with the agreement "shall provide cause for termination." Additionally, the agreement provided that by signing it, "Glemaud hereby releases and forever discharges MetroHealth from any and all charges, actions, claims or liabilities in connection with his employment and/or termination."

**{¶44}** The following day, on March 11, Glemaud told Reimer that he would not sign the return to work agreement. In the letter to Reimer, Glemaud called the agreement "both illegal and outrageous." Glemaud said that he had been "both

discriminated against because of [his] race and retaliated against because of [his] complaints of race discrimination." Glemaud informed Reimer that he would not sign the agreement because he would not give up his legal right to sue for discrimination, nor would he agree to give up his right to privacy regarding his psychiatric treatment.

{¶45} On March 17, 2008, Reimer notified Glemaud that MetroHealth would remove the paragraph in the agreement that required him to give up his legal claims, but that it would not remove the requirement that Glemaud sign releases for representatives of the EAP to have access to his psychiatric records. Reimer told Glemaud that "because your fitness for duty evaluation identified the necessity for you to receive ongoing psychological treatment, MetroHealth must secure the release of information related to that ongoing treatment in order to ensure compliance with the treatment regimen." Reimer gave Glemaud until March 21, 2008, to execute and return the agreement as modified as well as the remediation plan.

{¶46} Glemaud never responded to Reimer's letter nor did he return to MetroHealth. Thus, MetroHealth officially terminated Glemaud by letter on March 27, 2008. Reimer told Glemaud in the letter, "[s]ince you failed to respond to my correspondence of March 17, 2008, MetroHealth will be terminating your employment effective today."

{¶47} Reimer's office prepared an employee separation and property clearance form, stating that Glemaud had been "discharged" for "separation reason code #23," which was "misconduct." Reimer claimed in his deposition that his secretary had made

a mistake and that it should have said that Glemaud "resigned" and "did not return from leave."

**{¶48}** The trial court granted summary judgment to MetroHealth in July 2017. It is from this judgment that Glemaud now appeals.

## II. Summary Judgment

**{¶49}** Civ.R. 56(C) provides that before summary judgment may be granted, a court must determine that (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the nonmoving party. *State ex rel. Duganitz v. Ohio Adult Parole Auth.*, 77 Ohio St.3d 190, 191, 672 N.E.2d 654 (1996).

**{¶50}** We review a trial court's decision on summary judgment under a de novo standard of review. *Baiko v. Mays*, 140 Ohio App.3d 1, 10, 746 N.E.2d 618 (8th Dist.2000). Accordingly, we afford no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate. *N.E. Ohio Apt. Assn. v. Cuyahoga Cty. Bd. of Commrs.*, 121 Ohio App.3d 188, 192, 699 N.E.2d 534 (8th Dist.1997). On appeal, just as the trial court must do, we must consider all facts and inferences drawn in a light most favorable to the nonmoving party. *Id*.

## III. Ohio Civil Rights Act

{¶51} R.C. 4112.02(A) was enacted as part of the Ohio Civil Rights Act in 1959. Am.Sub.S.B. No. 10, 128 Ohio Laws 12. The standards for establishing a discrimination claim under R.C. Chapter 4112 are equally applicable to federal claims under Title VII. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021, fn. 2 (6th Cir.2000); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992).

{¶52} To establish a claim of discrimination, plaintiffs must prove not only discriminatory animus, but also "a consequential prohibited act." *Mauzy v. Kelly Servs.*, 75 Ohio St.3d 578, 588, 664 N.E.2d 1272 (1996).[3] The Ohio Supreme Court explained in *Mauzy*:

> "[Title VII was meant] to eradicate discriminatory actions in the employment setting, not mere discriminatory thoughts. Critics of the bill that became Title VII labeled it a 'thought control bill,' and argued that it created a 'punishable crime that does not require an illegal external act as a basis for judgment.' 100 Cong.Rec. 7254 (1964) (remarks of Sen. Ervin). Senator Case * * * responded:

> "The man must do or fail to do something in regard to employment. There must be some specific external act, more than a mental act. Only if he does the act because of the grounds stated in the bill would there be any legal consequences."

*Mauzy* at 587, quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

{¶53} Under both federal and Ohio standards, a plaintiff alleging discrimination bears the initial burden of setting forth a prima facie case of discrimination by using

---

[3] *Mauzy* is an age discrimination case. "Race discrimination cases use the almost identical standard of review as age discrimination cases." *Oleksiak v. John Carroll Univ.*, 8th Dist. Cuyahoga No. 84639, 2005-Ohio-886, ¶ 17.

either direct or indirect evidence. *Chang v. Univ. of Toledo*, 480 F.Supp.2d 1009, 1013 (N.D.Ohio 2007), citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). "Direct evidence of discrimination is 'that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir.2003), quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921 (6th Cir.1999). But "if the employee is unable to establish a causal link or nexus between the employer's discriminatory statements or conduct and the act that allegedly violated the employee's rights under the statute, then the employee has not provided direct evidence of discrimination." *Oleksiak* at ¶ 17, citing *Byrnes v. LCI Communication Holdings Co.*, 77 Ohio St.3d 125, 672 N.E.2d 145 (1996).

**{¶54}** In direct evidence cases, once a plaintiff shows that race played a motivating part in the employment decision, "'the burden of both production and persuasion shifts to the employer to prove by a preponderance of the evidence that it would have terminated the employee even if it had not been motivated by impermissible discrimination.'" *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir.2003), quoting *Nguyen v. Cleveland*, 229 F.3d 559 (6th Cir.2000). As a practical matter, rarely will there be direct evidence from the lips of an employer proclaiming racial animus. *Robinson v. Runyon*, 149 F.3d 507, 513 (6th Cir.1998).

**{¶55}** Plaintiffs who lack direct evidence of intentional discrimination may establish a prima facie case of discrimination through indirect evidence. Indirect

evidence "is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler* at 570, citing *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348 (6th Cir.1997). Establishing a prima facie case of discrimination through indirect evidence requires plaintiffs to show that they: (1) are a member of a protected class, (2) suffered an adverse employment action, (3) were qualified for the position, and (4) were replaced by an individual outside the protected class or treated less favorably than a similarly-situated individual outside the protected class. *Mitchell*, 964 F.2d at 582; *McDonnell Douglas* at 802.

{¶56} If the employee establishes a prima facie case through indirect evidence, then the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the employer submits admissible evidence that "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action," then the employer has met its burden of production. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). At this point, the presumption created by the prima facie case drops from the case because the employer's evidence rebutted the presumption of discrimination. *Id.* at 510.

{¶57} If the employer fails to meet its burden of production, however, and "reasonable minds could differ as to whether a preponderance of the evidence establishes

the facts of a prima facie case," then the question of whether the employer discriminated must be decided by the factfinder. *Id*. at 509-510.

{¶58} Finally, if the employer advances legally sufficient grounds for the adverse employment action, then the burden shifts back to the employee to show by a preponderance of the evidence that the reasons articulated by the employer were merely a pretext for unlawful discrimination. *Barker v. Scovill, Inc*., 6 Ohio St.3d 146, 148, 451 N.E.2d 807 (1983). The employee "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine* at 256.

{¶59} Thus, if an employee fails to set forth facts that establish a prima facie case of employment discrimination or fails to issue the evidentiary rejoinder to the asserted lawful basis for the adverse employment action, then the employee's claim must fail.

{¶60} Further, the ultimate burden of persuading the trier of fact that the employer discriminated against the plaintiff remains at all times with the plaintiff. *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089, 67 L.Ed.2d 207, citing *Bd. of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978).

## IV. Direct Evidence of Discrimination

{¶61} Glemaud first contends that the trial court erred when it granted summary judgment to MetroHealth because he presented direct evidence of discrimination.

### A. Meaning of "Direct Evidence"

**{¶62}** In the context of discrimination claims, direct evidence "'does not refer to whether evidence is direct or circumstantial in the ordinary evidentiary sense in which we normally think of those terms. Instead, "direct evidence" refers to a type of evidence which, if true, would require no inferential leap in order for a court to find discrimination.'" *Mitchell v. Lemmie*, 2d Dist. Montgomery No. 21511, 2007-Ohio-5757, ¶ 102, quoting *Bass v. Bd. of Cty. Commrs., Orange County, Fla.*, 256 F.3d 1095 (11th Cir.2001). An examination of Ohio and federal case law will elucidate this point.

**{¶63}** In *Mauzy*, 75 Ohio St.3d 578, 664 N.E.2d 1272, the Ohio Supreme Court examined the meaning of "direct evidence" within the context of establishing a prima facie case of discrimination. The lower court in *Mauzy* found that the employee did not present direct evidence of age discrimination, and "as a result, appellants were required to present a prima facie case of discrimination by proving the four elements set forth in the syllabus of *Kohmescher* [*v. Kroger Co.*, 61 Ohio St.3d 501, 575 N.E.2d 439 (1991)]."[4] *Mauzy* at 581. The Ohio Supreme Court explained that in making this determination, the lower court "relied on the definition of 'direct evidence' as set forth in *Black's Law Dictionary* 414 (5th Ed.1979): 'Evidence that directly proves a fact, without an inference or presumption, and which in itself, if true, conclusively establishes that fact.'" *Id.*

---

[4]The syllabus of *Kohmescher* is essentially the *McDonnell Douglas* test, which the Ohio Supreme Court adopted in *Barker*, 6 Ohio St.3d 146, 148, 451 N.E.2d 807.

{¶64} Both parties agreed in *Mauzy* that the lower court's interpretation of the words "direct evidence" amounted "to a rendition of a dichotomy between 'direct' and 'circumstantial' evidence." *Id*. at 584. The employer argued "that a plaintiff attempting to produce direct evidence to avoid application of the *McDonnell Douglas* test [i.e., by direct evidence] cannot rely upon the presentation of merely circumstantial evidence." *Id*. at 584. The Supreme Court disagreed.

{¶65} The Supreme Court held in *Mauzy* that direct evidence of discrimination "refers to a method of proof, not a type of evidence." *Id*. at paragraph one of the syllabus. The court referred to "direct evidence" as a "misnomer" because it "means that a plaintiff may establish a prima facie case of age discrimination directly by presenting evidence, *of any nature*, to show that an employer more likely than not was motivated by discriminatory intent." (Emphasis added.) *Id*. at paragraph one of the syllabus and 586.

{¶66} The Supreme Court found that Mauzy presented direct evidence of discrimination. Mauzy had begun working with Kelly Services, Inc. ("Kelly") in 1974 as a branch manager in Mentor, Ohio. Throughout her career, she repeatedly received exceptional performance evaluations. In 1987, she received a "Manager of the Year Award." In September 1987, however, Mauzy received a new supervisor. Over the next few years, Mauzy claimed that her new supervisor consistently gave her negative evaluations and berated her in front of coworkers for things the new supervisor allowed younger people to do.

{¶67} Mauzy further alleged that when the new supervisor took over, she "made it absolutely clear that she wanted younger people hired, and would only allow consideration of recent college graduates." *Mauzy*, 75 Ohio St.3d at 580, 664 N.E.2d 1272. The supervisor's first question was, "What is the applicant's age?" *Id*. The supervisor also asked Mauzy when she planned to retire and told her that "if I were you, I would take the money and run." *Id*. Additionally, the supervisor wrote a note in Mauzy's final performance evaluation that "you can't teach an old dog new tricks." *Id*.

{¶68} In 1992, Mauzy's supervisor reassigned her to a new position with the same pay, but told Mauzy that she had to relocate to Kelly's Mayfield office. Mauzy refused to accept the transfer and was terminated. A month later, Mauzy sued Kelly for age discrimination.

{¶69} When looking at the facts in *Mauzy*, there was no direct proof in the traditional sense. Mauzy's supervisor did not tell her or someone else that she was reassigning Mauzy to a new position and location because she was too old. In fact, the supervisor said that Kelly was downsizing and reorganizing. Thus, when the Supreme Court concluded that Mauzy presented "direct evidence" of discriminatory animus, it did not mean "direct evidence" in the traditional definition of the word because Mauzy's evidence of discrimination was certainly circumstantial. But the Supreme Court explained that

> [t]he caliber of evidence as "direct" does, indeed, eschew reliance on the
> *McDonnell Douglas* paradigm, not because it is the sole alternative method

by which to create an inference of discrimination, but because it rises to the level of actually proving discrimination.

*Id*. at 586. Thus, the court held that Mauzy established discriminatory intent or animus. She still, however, had to establish that she had been discharged.[5]

{¶70} The Supreme Court went on to conclude that Mauzy presented sufficient evidence to create a genuine issue of material fact that she was constructively discharged because of her age. The court explained:

> Under the record developed in the trial court, there is evidence showing that Mauzy met with great success over the years in her position as resident branch manager at Kelly's Mentor branch. When Hart took over as Mauzy's supervisor, she expressed her preference for younger employees, inquired into Mauzy's plans to retire, and told her to "take the money and run." She berated Mauzy in front of her coworkers, gave her negative evaluations, reduced her staff and territory, introduced a younger employee to Mauzy's key customers, and noted in Mauzy's final evaluation that "you can't teach an old dog new tricks." Subsequently, she sought to transfer Mauzy to a position that was newly created, and which was never filled following Mauzy's separation from employment, while replacing Mauzy with a younger employee with a lower rating. Although appellees' version of the events is markedly different, in our view reasonable minds could conclude from the evidence that appellees were motivated by discriminatory animus and that Mauzy was constructively discharged from her employment. Thus, Mauzy has presented sufficient evidence to raise an inference of age discrimination under former R.C. 4101.17.

*Id*. at 589-590.

**B. Statements as Direct Evidence**

---

[5]Former R.C. 4101.17 (now renumbered R.C. 4112.14), on which Mauzy's claim was based, provided in part as follows: "(A) No employer shall discriminate in any job opening against any applicant or discharge without just cause any employee aged forty or older who is physically able to perform the duties and otherwise meets the established requirements of the job and laws pertaining to the relationship between employer and employee."

**{¶71}** In this case, Glemaud contends that he presented direct evidence of discrimination because "Dr. Morris (1) made racially insensitive remarks about a black female patient, (2) directed a vile racial epithet at him in an attempt to incite him after security officers had been summoned, and (3) abruptly resigned after the only two black male residents had been forced out of the program."

**{¶72}** We note at the outset that we disagree with Glemaud that the fact that Dr. Morris "abruptly quit" after he and another black resident left the residency program amounts to direct evidence of discrimination. There is simply no evidence that MetroHealth forced Dr. Morris to leave the hospital because she discriminated against black residents. Thus, we will only consider whether Dr. Morris's other alleged statements amounted to direct evidence of discriminatory animus.

**{¶73}** Glemaud claims that "early on" in his interactions with Dr. Morris, he was presenting an African-American female patient to her when she made some "troublesome statements." As he was presenting the patient, he claims that Dr. Morris interrupted him and stated, "let me guess; you know, I can tell you about her," and proceeded "to predict that the woman was a single mother who was out of work and had a boyfriend who was in and out of prison." Dr. Morris allegedly continued, "that's the way their lives go."

**{¶74}** Glemaud further claims that after Dr. Morris called security officers to come to the department conference room on October 2, 2007, she approached Glemaud, grabbed his arm and stated, "come on, nigger, hit me[,] * * * you know you want to." He claims that he was shocked and tried to move away, but that she would not let him.

**{¶75}** "An employer's discriminatory comments may constitute direct evidence that an employee who was the subject of an adverse employment action was a victim of discrimination." *Brown v. Tellermate Holdings, Ltd.*, S.D.Ohio No. 2:11-cv-1122, 2015 U.S. Dist. LEXIS 113962, 7 (Aug. 27, 2015). Courts consider four factors to determine whether an employer's comments demonstrate discrimination:

> (1) whether the statements were made by a decision-maker or by an agent within the scope of his employment; (2) whether the statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the act of termination.

*Skelton v. Sara Lee Corp.*, 249 F.Appx. 450, 455 (6th Cir.2007), citing *Peters v. Lincoln Elec. Co.*, 285 F.3d 456 (6th Cir.2002). "None of these factors is individually dispositive of * * * discrimination, but rather, they must be evaluated as a whole, taking all of the circumstances into account." *Peters* at 478, citing *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325 (6th Cir.1994).

**C. Analysis**

**{¶76}** In the present case, after reviewing the evidence in a light most favorable to Glemaud, we conclude that he has not shown that MetroHealth was more likely than not motivated by discriminatory animus. Thus, he has not presented sufficient direct evidence of discrimination. As the Ohio Supreme Court explained in *Mauzy*, a plaintiff-employee can avoid the *McDonnell Douglas* paradigm in a discrimination action when the caliber of direct evidence "rises to the level of actually proving discrimination." *Id.*, 75 Ohio St.3d at 586, 664 N.E.2d 1272. The caliber of evidence that Glemaud

presented here simply does not rise to the level of proving discrimination as it did in *Mauzy*.

{¶77} Regarding Dr. Morris's alleged comments about the female African-American patient, Glemaud did not say when this occurred. Nonetheless, the alleged comments were certainly not related to any adverse employment action.

{¶78} Regarding Dr. Morris's alleged racial slur against Glemaud, we have serious doubts as to whether it creates an issue of fact at all. Rosko and three MetroHealth security guards were standing near Dr. Morris and Glemaud when she allegedly called Glemaud a racial slur, and none of them heard it. Dr. Morris denies saying it. Glemaud claims that he told Dr. Emerman in the emergency room right after it happened, but Dr. Emerman denies that Glemaud ever told him such a thing. Most glaringly, Glemaud submitted a handwritten discrimination complaint to MetroHealth's human resources department later that same night, and Glemaud failed to include this very important detail — such an important detail that he is now claiming it is direct evidence of discrimination — in the complaint. Just as troublesome to Glemaud's allegation is the fact that he did not officially inform MetroHealth of this purported racial slur by Dr. Morris until he included it in a letter to Dr. Emerman on October 24, 2007, and then also in his typed complaint on October 29, 2007 — over three weeks after Dr. Morris allegedly made the remark.

{¶79} But even if we were to assume for the sake of argument that there is an issue of fact as to whether Dr. Morris called Glemaud a racial slur, it still would not create a

genuine issue of *material fact* regarding direct evidence of discrimination. Dr. Morris's alleged comment was not made in relation to the adverse employment action — because Dr. Morris had already made the decision to suspend Glemaud — based on his poor medical performance (as reported by at least four other supervising doctors besides Dr. Morris, one of whom was African American) and his behavior (as reported by Dr. Morris, Rosko, and Dr. Papadakis).

{¶80} Dr. Morris's reasons for suspending Glemaud are well documented. Three other doctors, one of whom is African American, informed Dr. Morris of the issues that Glemaud had during his first rotation in IPS. Dr. Papadakis also informed Dr. Morris of the grave concerns that she had with Glemaud's performance when she supervised him as the attending physician of the IPS rotation, beginning on September 27, 2007, that both she and Dr. Morris emphasized were issues that could have seriously harmed patients.

{¶81} Further, when Dr. Morris and Rosko met with Glemaud on September 21, 2007, both say that he became very angry when Dr. Morris informed him that he had to repeat the IPS rotation and follow a "plan of action" to improve his medical knowledge and skills as a doctor. Dr. Morris contends that Glemaud even "lurched" toward her in an angry manner during this meeting. And rather than attempt to learn from his mistakes, Glemaud wanted to know who his "accusers" were. Dr. Morris specifically told Glemaud that the "plan of action" was not discipline or a remediation plan. Instead, it was to "assist [him] further in improving [his] skills as an intern" and making him "successful in the residency program." In fact, the "plan of action" encompassed many

of the recommendations that Glemaud's supervising doctors, Drs. Bruno, Adebambo, and Hallak, had already given him. Nonetheless, Glemaud "vehemently" opposed the basis of the meeting

{¶82} According to Rosko's affidavit and notes from the meeting on September 21 and October 1, Glemaud "took offense, got defensive, raised his voice and often exhibited signs of extreme anger" when presented with criticisms of his work. Rosko said that Glemaud "demanded the names of attendings and residents who raised performance issues so that he could personally confront them." Rosko further stated that Glemaud reacted defiantly to Dr. Morris "and the counseling attempts by the department." Rosko asserted that he privately tried to tell Glemaud that he "needed to accept some responsibility and criticism about his performance" because no one wanted to see him fail.

{¶83} Thus, based on the evidence presented by the hospital, it was well documented why Drs. Morris and Papadakis were requiring Glemaud to follow a "plan of action" first and then a remediation plan as well as seek help from the EAP. They had serious concerns with Glemaud's performance as a resident and his care of patients as well as his anger issues. Glemaud argues that there is nothing in the record to show why Dr. Morris first wanted Glemaud to just follow a "plan of action" on September 21, but then changed it to an official remediation plan on October 1. Glemaud is incorrect, however, because Dr. Papadakis was the attending physician for the IPS rotation (and as such, Glemaud's supervisor) from September 27 to October 3. Dr. Papadakis

documented several serious issues that occurred during this time (or, at the very least, between September 27 and October 1, when the meeting took place). Although she did not write this narrative documenting such critical errors until October 8, she told Dr. Morris what occurred, and they decided to act immediately. Josh Rosko's notes from the October 1 meeting establish that Dr. Papadakis explained her concerns and the seriousness of them to Glemaud at the October 1 meeting — the exact same concerns that she later placed in her October 8 narrative. Thus, Glemaud's attempt to claim that Dr. Papadakis's narrative was "after the fact" is simply not supported by the evidence.

{¶84} Accordingly, we conclude that Glemaud failed to present sufficient direct evidence of race and national origin discrimination to survive summary judgment. He did not present evidence that created genuine issues of material fact as to whether MetroHealth was, more likely than not, motivated by discriminatory intent or animus. Thus, to survive summary judgment, Glemaud had to establish the four requirements under the *McDonnell Douglas* paradigm. **V. *McDonnell Douglas* Test**

{¶85} To survive summary judgment on a race discrimination case when there is not direct evidence of discrimination, a plaintiff must establish a prima facie case using the *McDonnell Douglas* test. Again, to establish a prima facie case under this test, plaintiffs must show that they (1) are a member of a protected class, (2) suffered an adverse employment action, (3) were qualified for the position, and (4) were replaced by an individual outside the protected class or treated less favorably than a similarly-situated

individual outside the protected class.  *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir.2002).

**{¶86}** In this case, Glemaud failed to present any evidence of the fourth requirement under *McDonnell Douglas* — that he was treated less favorably than a similarly-situated individual outside the protected class.   He asserts that he satisfied this element by presenting evidence that another black resident, a Nigerian-born physician, was forced out of the program.   This fact, however, does not establish that he was treated less favorably than a similarly-situated individual outside the protected class. Because Glemaud does not present any evidence of the fourth requirement of the *McDonnell Douglas* test, we do not need to address whether he met the other requirements.

**{¶87}** Accordingly, Glemaud has not established a prima facie case through the *McDonnell Douglas* test.   The burden therefore does not shift to MetroHealth to articulate a nondiscriminatory reason for its actions.

## VI. Exhaustion of Administrative Remedies

**{¶88}** Finally, Glemaud argues that the trial court erred when it determined that summary judgment to MetroHealth was appropriate because Glemaud failed to exhaust his administrative remedies by appealing MetroHealth's decision to the graduate medical education committee.   Because we have found that the trial court's decision granting summary judgment to MetroHealth was proper for other reasons, this argument is moot.

**{¶89}** Glemaud's sole assignment of error is overruled.

**{¶90}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

[Cite as *Glemaud v. MetroHealth Sys.*, 2018-Ohio-4024.]
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of

the Rules of Appellate Procedure.

_____

_____
MARY J. BOYLE, JUDGE

TIM McCORMACK, P.J., and
MELODY J. STEWART, J., CONCUR