[Cite as *Robinson v. Lafarge N. Am., Inc.*, 2022-Ohio-231.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY


Stephanie Robinson, Individually,
and Administrator of the Estate of
Thomas Robinson

       Appellant

v.

Lafarge North America, Inc., et al.

       Appellee

Court of Appeals No.  L-21-1091

Trial Court No. CI0201903333


**<u>DECISION AND JUDGMENT</u>**

Decided:  January 28, 2022

* * * * *

Kevin J. Boissoneault and Jonathan M. Ashton, for appellant.

Philip S. Heebsh and Lauren M. Smith, for appellee.

* * * * *

**DUHART, P.J.**

**{¶ 1}** Appellant, Stephanie Robinson, appeals from a decision by the Lucas County Court of Common Pleas granting summary judgment in favor of appellee, Lafarge North America, Inc. ("Lafarge"). For the reasons that follow, we affirm.

## Statement of the Case

{¶ 2} The instant case is a wrongful death action filed by appellant on behalf of the estate of her husband, Thomas Robinson ("the Decedent"). Appellant's claims arise from a workplace incident at The Andersons, during which the Decedent, while in the process of cleaning out a railcar that was used by Lafarge, was engulfed and suffocated by cement powder that flowed out of one of the car's hopper chutes and onto the Decedent's body. Lafarge denied liability and filed a motion for summary judgment. The trial court granted Lafarge's motion, finding no factual basis to support a duty owed to the Decedent. Appellant filed a timely notice of appeal.

## Assignment of Error

{¶ 3} Appellant sets forth the following as her sole assignment of error:

The trial court erred when it granted summary judgment in favor of Lafarge North America, Inc.

## Statement of the Facts

### A. Events Leading up to the Incident

{¶ 4} Lafarge was storing a series of railcars at McKees Rocks Industrial Enterprises, in Pennsylvania, when it decided that the railcars would be moved to another location for change of service. Lafarge realized that before the change of service could be effectuated, the railcars would need to be emptied and repaired. In an effort to get this work performed, Lafarge representative Michael Hrivnak contacted contractor CRMS,

2.

who subsequently connected him with Sam Anderson, Vice President of Operations for The Andersons. From there, Anderson asked Tab Brown, an estimator for The Andersons, to assist. In an email dated July 12, 2017, Hrivnak asked Brown whether The Andersons could take five "mostly empty" railcars for clean out -- including the removal of any residual product -- for inspection, and for repairs. Thereafter, five railcars were shipped to The Andersons.

{¶ 5} Steven Hutchinson, Area Manager for The Andersons, was included in the July 12 email to Brown, and was aware of the arrival of the railcars at the facility. At deposition, Hutchinson testified that although a customer's initial communication might be with an estimator, such as Brown, Hutchinson, as the Area Manager would have to approve any railcars coming into the facility. According to Hutchinson, his understanding was that Lafarge was looking to have the five railcars cleaned out and repaired so that they could be put back into service. He further stated that although Lafarge did not provide a material data safety sheet for the cement powder that was contained in the cars, The Andersons did not consider that one was needed. Instead, The Andersons felt like it was equipped to handle the job of removing cement powder from the railcars, based on previous work it had done.

{¶ 6} Hutchinson testified that he never requested instructions from Lafarge or from any other entity prior to accepting the job, because The Andersons, "as the repair unit[,] would estimate the car for whatever repairs [were] needed and [would] clean the

3.

car out" as needed. Hutchinson testified that this was typical as "a lot of car owners and shippers" don't have expertise on how to carry out repairs of the equipment they bring in for repair; instead, they "rely on the shop to do that."

{¶ 7} After the cars arrived at The Andersons facility, they were inspected at length by The Andersons estimator, Randall Goben. To inspect the cars, Goben removed the lid covers from each car and looked inside. During his inspection, Goben observed the amount and condition of cement powder in each railcar. Following Goben's inspection, The Andersons became aware that there was more product in the cars than was initially estimated, which was a "pretty common" occurrence. According to Hutchinson, when this would happen, there would be a discussion to determine whether or not The Andersons wanted to do the work. In the case of the Lafarge cars, it was ultimately determined that The Andersons was both willing and able to do the job.

{¶ 8} After Goben completed his inspection, he prepared a final estimate that was contained in a document identified as a "billing repair card." The billing repair card included a line item indicating that the particular railcar that was involved in the incident contained product from one end of the railcar to the other. The billing repair card further stated that it would take 47 hours to clean all five railcars, and that 30 of those hours would be devoted to cleaning the subject car. Hutchinson stated that the number of hours that were assigned to cleaning directly correlated to the amount of product that was contained in the railcar.

4.

{¶ 9} Prior to beginning the maintenance activities on the railcars, The Andersons provided a work order to Jeremy Clouse, who was the crew leader of the Decedent's crew at the time of the incident. The work order specified that the crew was allotted 30 hours to unload the subject car. Like Hutchinson, Clouse understood that the number of hours allotted to unloading was reflective of the amount of product that was contained in the car. According to Clouse, in addition to the information contained in the work order, Hutchinson himself had advised him that the railcars contained cement powder.

## B. The Incident

{¶ 10} After receiving the work order, Clouse informed his crew, including the Decedent, that they were given 30 hours to clean out the subject railcar. Kristopher Puls, another member of the Decedent's crew, testified that although he couldn't specifically remember this happening in connection with the job in question, it was typical for a crew leader to indicate the amount of product that was present in a railcar that was meant to be emptied.

{¶ 11} Work cleaning the subject railcar began on August 9, 2017. Both Puls and Joseph Trembach, another member of the crew from The Andersons, testified that the railcar's transfer tubes could not be used to empty the railcars with a vacuum truck, because cement had hardened in the tubes, rendering them unusable. Thus, as indicated in the work order that was connected with the job, the crew's first task was to remove the transfer tubes. Once the transfer tubes were removed, pans were placed under the hopper

5.

chutes, which were located on the underside of the railcar. The hopper chutes were opened, allowing the cement powder to pour out of the car and onto the pans. Forklifts and Bobcats were then used to collect and dump the emptied product into a nearby dumpster.

{¶ 12} Next, the hatch covers at the top of the railcar were opened to permit the crew to dislodge powder inside the railcar from the top side, with a poker. The poker consisted of a 20-foot bar with a scraper on one end. The crew would continuously check the inside of the railcar through the hatch covers to determine the amount of product that remained.

{¶ 13} While performing this maintenance, a crew member who was using the poker to dislodge cement powder from the top of the railcar dropped the poker, causing it to fall down inside the railcar. At that point, Clouse and his crew gathered to discuss finding another poker, because "no one [wanted] to get [] inside there – you know with product still in there." The Decedent then decided to go underneath the railcar and position himself halfway inside the hopper chute, kneeling to the side of the chute's opening with his arm on the inside. The Decedent did not inform any of his crew members that he was going to retrieve the poker from inside the hopper chute. While he was still inside, cement powder became dislodged and flowed out of the chute, engulfing the Decedent, and, ultimately, killing him by asphyxiation.

6.

## Analysis

{¶ 14} Appellate court review of a trial court's judgment granting a motion for summary judgment is *de novo*. *K&D Mgt., L.L.C. v. Jones*, 8th Dist. Cuyahoga No. 110262, 2021-Ohio-4310, ¶ 16. Thus, an appellate court "examine[s] the evidence to determine if as a matter of law no genuine issues exist for trial." *Brewer v. Cleveland Bd. of Edn.*, 122 Ohio App.3d 378, 383, 701 N.E.2d 1023 (8th Dist.1997). In doing so, an appellate court must "consider all facts and inferences drawn in a light most favorable to the nonmoving party." *Glemaud v. MetroHealth Sys.*, 8th Dist. Cuyahoga No. 106148, 2018-Ohio-4024, ¶ 50.

{¶ 15} Summary judgment is properly granted where: (1) "there is no genuine issue as to any material fact," (2) "the moving party is entitled to judgment as a matter of law," and (3) "reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made." *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66, 375 N.E.2d 46 (1978); see also Civ.R. 56(C).

{¶ 16} The moving party has the initial burden of identifying "those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the nonmoving parties claims." *Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996). If the moving party fails to meet this burden, summary judgment is not appropriate. *Id.* But if the moving party meets this burden, the non-

7.

moving party then "has a reciprocal burden * * * to set forth specific facts showing that there is a genuine issue for trial." *Id.*

{¶ 17} To prove a claim for negligence, appellant must show: "(1) the existence of a legal duty, (2) the defendant's breach of that duty, and (3) injury that is the proximate cause of the defendant's breach." *Wallace v. Ohio Dept. of Commerce,* 96 Ohio St.3d 266, 2002-Ohio-4210, 773 N.E.2d 1018, ¶ 22, citing *Mussivand v. David*, 45 Ohio St.3d 314, 318, 544 N.E.2d 265 (1989).

{¶ 18} The main issue presented in this appeal is whether Lafarge owed a duty of care to the Decedent. "Duty, as used in Ohio tort law, refers to the relationship between the plaintiff and the defendant from which arises an obligation on the part of the defendant to exercise due care toward the plaintiff." *Commerce & Industry Ins. Co.*, 45 Ohio St.3d 96, 98, 543 N.E.2d 1188 (1989). "[T]he existence of a duty depends upon the foreseeability of harm: if a reasonably prudent person would have anticipated that an injury was likely to result from a particular act, the court could find that the duty element of negligence is satisfied." *Wallace* at ¶ 23.

{¶ 19} Challenging the trial court's determination that the harm to the Decedent was unforeseeable in this case, appellant presents the following argument:

> In this case, Lafarge manufactured the cement, knew its purpose, and knew there was a possibility for injury when they sent the train car to The Andersons. Lafarge was aware that the condition of the cement was no

8.

longer in powder form and had hardened. Further, Lafarge misrepresented to The Andersons the true condition of the cement. By sending a train car in such a manner and concealing the condition of the cement, Lafarge eliminated any safe and proper way of removing the cement. Thus, guaranteeing a foreseeable injury.

{¶ 20} In response to this argument, Lafarge accurately points out that appellant's only evidence to support her position is a set of emails between representatives for Lafarge and The Andersons in which the former apparently inaccurately indicates that the railcars are "mostly empty." The record is clear, however, that the emails upon which appellant relies were all sent before the railcars were shipped to The Andersons, and before Randall Goben, estimator for The Andersons, personally inspected each railcar and made the determination, along with Steven Hutchinson, area manager for The Andersons, that The Andersons was equipped to handle the work requested by Lafarge.

{¶ 21} In addition, the record is clear that the Decedent and his crew were not included in these emails. Rather the Decedent and his crew operated from the work order, which flowed from Goben's estimate. Therefore, from the Decedent and his crew's point of view, the emails are entirely irrelevant – neither the Decedent nor the crew were ever informed by any party that the cars were "mostly empty." Instead, the Decedent and his crew all knew, from the work order, from their work on cars prior to the

9.

railcar at issue, and from the time they spent working on the railcar at issue, the type and amount of material that was contained within the cars.

{¶ 22} The Decedent's spontaneous action of positioning his body halfway inside the hopper chute, while he and the rest of his crew were in the process of attempting to dislodge cement powder to send out through the chute, was patently unforeseeable to Lafarge. We therefore find, as a matter of law, that Lafarge did not owe the Decedent a duty in this case.

{¶ 23} In a final attempt to avoid this conclusion, appellant argues in her reply brief that "Lafarge knew there was a problem with emptying the cars and chose to drop the problem in the laps of a railcar repair group with little-to-know [sic] knowledge of what to do with Lafarge's product." In addition, appellant asserts that "Lafarge clearly knew the nature of its own product as well as the fact that the product had hardened in the vacuum discharge tubes thereby preventing The Andersons from safely unloading the cars."

{¶ 24} First, the evidence is undisputed that The Andersons believed it had the knowledge, experience, and ability to safely empty powder cement from a railcar, even one with unusable vacuum discharge tubes. Nothing in the evidence suggests that there was any duty on the part of Lafarge to send in, or any expectation on the part of The Andersons to receive, an empty car for repair. Neither is there any evidence to suggest that it was unsafe for Lafarge to deliver a partially-filled car. Finally, there is no

10.

evidence to suggest that Lafarge has any particular knowledge of the safety and skill required either to unload or to repair a rail car. Instead, the evidence showed only that Lafarge relied on the expertise of others, such as The Andersons, to get those jobs done.

{¶ 25} The harm in this case was caused not because the car contained product, or because the clean-out process was deceitfully, or otherwise wrongfully, placed into the hands of someone with inferior knowledge. The harm occurred because the Decedent, of his own accord, positioned himself inside the partially-emptied car, directly in harm's way.

{¶ 26} For all of the foregoing reasons, appellant's sole assignment of error is found not well-taken, and the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Stephanie Robinson, Individually,
and Administrator of the Estate
of Thomas Robinson
v. Lafarge North America, Inc., et al.
Case No. L-21-1091

Mark L. Pietrykowski, J.

Thomas J. Osowik, J.

Myron C. Duhart, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

> This decision is subject to further editing by the Supreme Court of
> Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
> version are advised to visit the Ohio Supreme Court's web site at:
> http://www.supremecourt.ohio.gov/ROD/docs/.